# FONG YUE TING *v.* UNITED STATES.

# WONG QUAN *v.* UNITED STATES.

# LEE JOE *v.* UNITED STATES.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Nos. 1345, 1346, 1347. Argued May 10, 1893. — Decided May 15, 1893.

The right to exclude or to expel aliens, or any class of aliens, absolutely or upon certain conditions, in war or in peace, is an inherent and inalienable right of every sovereign and independent nation.

In the United States, the power to exclude or to expel aliens is vested in the political departments of the national government, and is to be regulated by treaty or by act of Congress, and to be executed by the executive authority according to the regulations so established, except so far as the judicial department is authorized by treaty or by statute, or is required by the Constitution, to intervene.

The power of Congress to expel, like the power to exclude, aliens, or any specified class of aliens, from the country, may be exercised entirely through executive officers; or Congress may call in the aid of the judiciary to ascertain any contested facts on which an alien's right to remain in the country has been made by Congress to depend.

Congress has the right to provide a system of registration and identification of any class of aliens within the country, and to take all proper means to carry out that system.

The provisions of an act of Congress, passed in the exercise of its constitutional authority, must, if clear and explicit, be upheld by the courts, even in contravention of stipulations in an earlier treaty.

Section 6 of the act of May 5, 1892, c. 60, requiring all Chinese laborers

Statement of the Case.

within the United States at the time of its passage, "and who are entitled to remain in the United States," to apply within a year to a collector of internal revenue for a certificate of residence; and providing that any one who does not do so, or is afterwards found in the United States without such a certificate, "shall be deemed and adjudged to be unlawfully in the United States," and may be arrested by any officer of the customs, or collector of internal revenue, or marshal, or deputy of either, and taken before a United States judge, who shall order him to be deported from the United States to his own country, unless he shall clearly establish to the satisfaction of the judge that by reason of accident, sickness, or other unavoidable cause, he was unable to procure his certificate, and "by at least one credible white witness" that he was a resident of the United States at the time of the passage of the act; is constitutional and valid.

THESE were three writs of *habeas corpus*, granted by the Circuit Court of the United States for the Southern District of New York, upon petitions of Chinese laborers, arrested and held by the marshal of the district for not having certificates of residence, under section 6 of the act of May 5, 1892, c. 60, which is copied in the margin.[1]

---

[1] An act to prohibit the coming of Chinese persons into the United States.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That all laws now in force, prohibiting and regulating the coming into this country of Chinese persons and persons of Chinese descent, are hereby continued in force for a period of ten years from the passage of this act.

SEC. 2. That any Chinese person or person of Chinese descent, when convicted and adjudged under any of said laws to be not lawfully entitled to be or remain in the United States, shall be removed from the United States to China, unless he or they shall make it appear to the justice, judge or commissioner before whom he or they are tried, that he or they are subjects or citizens of some other country, in which case he or they shall be removed from the United States to such country: Provided, that in any case where such other country, of which such Chinese person shall claim to be a citizen or subject, shall demand any tax as a condition of the removal of such person to that country, he or she shall be removed to China.

SEC. 3. That any Chinese person, or person of Chinese descent, arrested under the provisions of this act or the acts hereby extended, shall be adjudged to be unlawfully within the United States, unless such person shall establish, by affirmative proof, to the satisfaction of such justice, judge or commissioner, his lawful right to remain in the United States.

Statement of the Case.

· The rules and regulations made· and promulgated by the Secretary· of the Treasury under section 7 of that act prescribe·

---

SEC. 4. That any such Chinese person, or person of Chinese descent, convicted and adjudged to be not lawfully entitled to be or remain in the United States, shall be imprisoned at hard labor for a period of not exceeding one year, and thereafter removed from the United States, as hereinbefore provided.

SEC. 5. That after the passage of this act, on an application to any judge or court of the United States in the first instance for a writ of *habeas corpus*, by a Chinese person seeking to land in the United States, to whom that privilege has been denied, no bail shall be allowed, and such application shall be heard and determined promptly without unnecessary delay.

SEC. 6. And it shall be the duty of all Chinese laborers, within the limits of the United States at the time of the passage of this act, and, who are entitled to remain in the United States, to apply to the collector of internal revenue of their respective districts, within one year after the passage of this act, for a certificate of residence; and any Chinese laborer, within the limits of the United States, who shall neglect, fail or refuse to comply with the provisions of this act, or who, after one year from the passage hereof, shall be found within the jurisdiction of the United States without such certificate of residence, shall be deemed and adjudged to be unlawfully within the United States, and may be arrested by any United States customs official, collector of internal revenue or his deputies, United States marshal or his deputies, and taken before a United States judge, whose duty it shall be to order that he be deported from the United States as hereinbefore provided, unless he shall establish clearly, to the satisfaction of said judge, that by reason of accident, sickness, or other unavoidable cause, he has been unable to procure his certificate, and to the satisfaction of the court, and by at least one credible white witness, that he was a resident of the United States at the time of the passage of this act; and if upon the hearing it shall appear that he is so entitled to a certificate, it shall be granted, upon his paying the cost. Should it appear that said Chinaman had procured a certificate which has been lost or destroyed, he shall be detained and judgment suspended a reasonable time to enable him to procure a duplicate from the officer granting it; and in such cases the cost of said arrest and trial shall be in the discretion of the court. And any Chinese person other than a Chinese laborer, having a right to be and remain in the United States, desiring such certificate as evidence of such right, may apply for and receive the same without charge.

SEC. 7. That immediately after the passage of this act the Secretary of the Treasury shall make such rules and regulations as may be necessary for the efficient execution of this act, and shall prescribe the necessary forms and furnish the necessary blanks to enable collectors of internal revenue to issue the certificates required hereby, and make such provisions

forms for applications for certificates of residence, for affidavits in support thereof, and for the certificates themselves; contain the provisions copied in the margin;[1] and also provide

---

that certificates may be procured in localities convenient to the applicants; such certificates shall be issued without charge to the applicant, and shall contain the name, age, local residence and occupation of the applicant, and such other description of the applicant as shall be prescribed by the Secretary of the Treasury; and a duplicate thereof shall be filed in the office of the collector of internal revenue for the district within which such Chinaman makes application.

SEC. 8. That any person who shall knowingly and falsely alter or substitute any name for the name written in such certificate, or forge such certificate, or knowingly utter any forged or fraudulent certificate, or falsely personate any person named in such certificate, shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not exceeding one thousand dollars, or imprisoned in the penitentiary for a term of not more than five years.

SEC. 9. The Secretary of the Treasury may authorize the payment of such compensation in the nature of fees to the collectors of internal revenue, for services performed under the provisions of this act, in addition to salaries now allowed by law, as he shall deem necessary, not exceeding the sum of one dollar for each certificate issued.

[1] Collectors of internal revenue will receive applications on the following form, at their own offices, from such Chinese as are conveniently located thereto, and will cause their deputies to proceed to the towns or cities in their respective divisions where any considerable number of Chinese are residing, for the purpose of receiving applications. No application will be received later than May 5, 1893.

Collectors and deputies will give such notice, through leading Chinese, or by notices posted in the Chinese quarter of the various localities, as will be sufficient to apprise all Chinese residing in their districts of their readiness to receive applications and the time and place where they may be made. All applications received by deputies must be forwarded to the collector's office, from whose office all certificates of residence will be issued, and sent to the deputy for delivery.

The affidavit of at least one credible witness of good character to the fact of residence and lawful status within the United States must be furnished with every application. If the applicant is unable to furnish such witness satisfactory to the collector or his deputy, his application will be rejected, unless he shall furnish other proof of his right to remain in the United States, in which case the application, with the proofs presented, shall be forwarded to the commissioner of internal revenue for his decision. The witness must appear before the collector or his deputy, and be fully questioned in regard to his testimony before being sworn.

for recording duplicates of the certificates in the office of the collector of internal revenue.

The first petition alleged that the petitioner was a person of the Chinese race, born in China, and not a naturalized citizen of the United States; that in or before 1879 he came to the United States, with the intention of remaining and taking up his residence therein, and with no definite intention of returning to China, and had ever since been a permanent resident of the United States, and for more than a year last past had resided in the city, county and State of New York, and within the second district for the collection of internal revenue in that State; that he had not, since the passage of the act of 1892, applied to the collector of internal revenue of that district for a certificate of residence, as required by section 6, and was and always had been without such certificate of residence; and that he was arrested by the marshal, claiming authority to do so under that section, without any writ or warrant. The return of the marshal stated that the petitioner was found by him within the jurisdiction of the United States, and in the Southern District of New York, without the certificate of residence required by that section; that he had therefore arrested him with the purpose and intention of taking him before a United States judge within that district; and that the petitioner admitted to the marshal, in reply to questions put through an interpreter, that he was a Chinese laborer, and was without the required certificate of residence.

The second petition contained similar allegations, and further alleged that the petitioner was taken by the marshal before the District Judge for the Southern District of New York, and that "the said United States Judge, without any hearing of any kind, thereupon ordered that your petitioner be

---

In all cases of loss or destruction of original certificates of residence, where it can be established to the satisfaction of the collector of the district in which the certificate was issued that such loss or destruction was accidental, and without fault or negligence on the part of the applicant, a duplicate of the original may be issued under the same conditions that governed the original issue.

remanded to the custody of the marshal in and for the Southern District of New York, and deported forthwith from the United States, as is provided in said act of May 5, 1892, all of which more fully appears by said order, a copy of which is hereto annexed and made a part hereof," and which is copied in the margin ;[1] and that he was detained by virtue of the marshal's claim of authority and the judge's order.. The marshal returned that he held the petitioner under that order.

In the third case the petition alleged, and the judge's order showed, the following state of facts : On April 11, 1893, the petitioner applied to the collector of internal revenue for a certificate of residence ; the collector refused to give him a certificate, on the ground that the witnesses whom he produced to prove that he was entitled to the certificate were persons of the Chinese race and not credible witnesses, and. required of him to produce a witness other than a Chinaman to prove that he was entitled to the certificate, which he was unable to do, because there was no person other than one of

---

[1] In the matter of the arrest and deportation of Wong Quan, a Chinese laborer.

Wong Quan, a Chinese laborer, having been arrested in the city of New York on the 6th day of May, 1893, and brought before me, a United States Judge, by John W. Jacobus, the marshal of the United States in and for the Southern District of New York, as being a Chinese laborer found within the jurisdiction of the United States after the expiration of one year from the passage of the act of Congress, approved on the 5th day of May, 1892, and entitled " An act to prohibit the coming of Chinese persons into the United States," without having the certificate of residence required by said act; and the said Wong Quan having failed to clearly establish to my satisfaction that by reason of accident, sickness or other unavoidable cause, he had been unable to procure the said certificate, or that he had procured such certificate and that the same had been lost or destroyed : Now, on motion of Edward Mitchell, the United States attorney in and for the Southern District of New York, it is Ordered, that the said Wong Quan be, and he hereby is, remanded to the custody of the said John W. Jacobus, the United States marshal in and for the Southern District of New York; and it is further Ordered, that the said Wong Quan be deported from the United States of America in accordance with the provisions of said act of Congress, approved on the 5th day of May, 1892.

Dated New York, May 6, 1893.　　　　　　　ADDISON BROWN,

*United States District Judge for the Southern District of New York.*

the Chinese race who knew and could truthfully swear that he was lawfully within the United States on May 5, 1892, and then entitled to remain therein; and because of such unavoidable cause he was unable to produce a certificate of residence, and was now without one. The petitioner was arrested by the marshal, and taken before the judge; and clearly established, to the satisfaction of the judge, that he was unable to procure a certificate of residence, by reason of the unavoidable cause aforesaid; and also established, to the judge's satisfaction, by the testimony of a Chinese resident of New York, that the petitioner was a resident of the United States at the time of the passage of the act; but having failed to establish this fact clearly to the satisfaction of the court by at least one credible white witness, as required by the statute, the judge ordered the petitioner to be remanded to the custody of the marshal, and to be deported from the United States, as provided in the act.

Each petition alleged that the petitioner was arrested and detained without due process of law, and that section 6 of the act of May 5, 1892, was unconstitutional and void.

In each case, the Circuit Court, after a hearing upon the writ of *habeas corpus* and the return of the marshal, dismissed the writ of *habeas corpus*, and allowed an appeal of the petitioner to this court, and admitted him to bail pending the appeal. All the proceedings, from the arrest to the appeal, took place on May 6.

*Mr. Joseph H. Choate* and *Mr. J. Hubley Ashton* for appellants.

*Mr. Maxwell Evarts* was on Mr. Choate's brief.

*Mr. Solicitor General* for appellees.

MR. JUSTICE GRAY, after stating the facts, delivered the opinion of the court.

The general principles of public law which lie at the foundation of these cases are clearly established by previous judg-

ments of this court, and by the authorities therein referred to.

In the recent case of *Nishimura Ekiu* v. *United States*, 142 U. S. 651, 659, the court, in sustaining the action of the executive department, putting in force an act of Congress for the exclusion of aliens, said : " It is an accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe. In the United States, this power is vested in the national government, to which the Constitution has committed the entire control of international relations, in peace as well as in war. It belongs to the political department of the government, and may be exercised either through treaties made by the President and Senate, or through statutes enacted by Congress."

The same views were more fully expounded in the earlier case of *Chae : Chan Ping* v. *United States*, 130 U. S. 581, in which the validity of a former act of Congress, excluding Chinese laborers from the United States, under the circumstances therein stated, was affirmed.

In the elaborate opinion delivered by Mr. Justice Field, in behalf of the court, it was said : " Those laborers are not citizens of the United States ; they are aliens. That the government of the United States, through the action of the legislative department, can exclude aliens from its territory is a proposition which we do not think open to controversy. Jurisdiction over its own territory to that extent is an incident of every independent nation. It is a part of its independence. If it could not exclude aliens, it would be to that extent subject to the control of another power." " The United States, in their relation to foreign countries and their subjects or citizens, are one nation, invested with powers which belong to independent nations, the exercise of which can be invoked for the maintenance of its absolute independence and security throughout its entire territory." 130 U. S. 603, 604.

It was also said, repeating the language of Mr. Justice

Bradley in *Knox* v. *Lee*, 12 Wall. 457, 555 : "The United States is not only a government, but it is a national government, and the only government in this country that has the character of nationality . It is invested with power over all the foreign relations of the country, war, peace, and negotiations and intercourse with other nations; all of which are forbidden to the state governments." 130 U. S. 605. And it was added: "For local interests the several States of the Union exist; but for international purposes, embracing our relations with foreign nations, we are but one people, one nation, one power." 130 U. S. 606.

The court then went on to say : " To preserve its independence, and give security against foreign aggression and encroachment, is the highest duty of every nation, and to attain these ends nearly all other considerations are to be subordinated. It matters not in what form such aggression and encroachment come, whether from the foreign nation acting in its national character, or from vast hordes of its people crowding in upon us. The government, possessing the powers which are to be exercised for protection and security, is clothed with authority to determine the occasion on which the powers shall be called forth; and its determination, so far as the subjects affected are concerned, is necessarily conclusive upon all its departments and officers. If, therefore, the government of the United States, through its legislative department, considers the presence of foreigners of a different race in this country, who will not assimilate with us, to be dangerous to its peace and security, their exclusion is not to be stayed because at the time there are no actual hostilities with the nation of which the foreigners are subjects. The existence of war would render the necessity of the proceeding only more obvious and pressing. The same necessity, in a less pressing degree, may arise when war does not exist, and the same authority which adjudges the necessity in one case must also determine it in the other. In both cases, its determination is conclusive upon the judiciary. If the government of the country of which the foreigners excluded are subjects is dissatisfied with this action, it can make complaint to the

executive head of our government, or resort to any other measure which, in its judgment, its interests or dignity may demand; and there lies its only remedy. The power of the government to exclude foreigners from the country, whenever, in its judgment, the public interests require such exclusion, has been asserted in repeated instances, and never denied by the executive or legislative departments." 130 U. S. 606, 607. This statement was supported by many citations from the diplomatic correspondence of successive Secretaries of State, collected in Wharton's International Law Digest, § 206.

The right of a nation to expel or deport foreigners, who have not been naturalized or taken any steps towards becoming citizens of the country, rests upon the same grounds, and is as absolute and unqualified as the right to prohibit and prevent their entrance into the country.

This is clearly affirmed in dispatches referred to by the court in *Chae Chan Ping's case*. In 1856, Mr. Marcy wrote: "Every society possesses the undoubted right to determine who shall compose its members, and it is exercised by all nations, both in peace and war. A memorable example of the exercise of this power in time of peace was the passage of the alien law of the United States in the year 1798." In 1869, Mr. Fish wrote: "The control of the people within its limits, and the right to expel from its territory persons who are dangerous to the peace of the State, are too clearly within the essential attributes of sovereignty to be seriously contested." Wharton's International Law Digest, § 206; 130 U. S. 607.

The statements of leading commentators on the law of nations are to the same effect.

Vattel says: "Every nation has the right to refuse to admit a foreigner into the country, when he cannot enter without putting the nation in evident danger, or doing it a manifest injury. What it owes to itself, the care of its own safety, gives it this right; and in virtue of its natural liberty, it belongs to the nation to judge whether its circumstances will or will not justify the admission of the foreigner." "Thus, also, it has a right to send them elsewhere, if it has just cause to

fear that they will corrupt the manners of the citizens; that they will create religious disturbances, or occasion any other disorder, contrary to the public safety. In a word, it has a right, and is even obliged, in this respect, to follow the rules which prudence dictates." Vattel's Law of Nations, lib. 1, c. 19, §§ 230, 231.

Ortolan says: "The government of each state has always the right to compel foreigners who are found within its territory to go away, by having them taken to the frontier. This right is based on the fact that, the foreigner not making part of the nation, his individual reception into the territory is matter of pure permission, of simple tolerance, and creates no obligation. The exercise of this right may be subjected, doubtless, to certain forms by the domestic laws of each country; but the right exists none the less, universally recognized and put in force. In France, no special form is now prescribed in this matter; the exercise of this right of expulsion is wholly left to the executive power." Ortolan, Diplomatie de la Mer, lib. 2, c. 14, (4th ed.) p. 297.

Phillimore says: "It is a received maxim of international law, that the government of a state may prohibit the entrance of strangers into the country, and may therefore regulate the conditions under which they shall be allowed to remain in it, or may require and compel their departure from it." 1 Phillimore's International Law, (3d ed.) c. 10, § 220.

Bar says: "Banishment and extradition must not be confounded. The former is simply a question of expediency and humanity, since no state is bound to receive all foreigners, although, perhaps, to exclude all would be to say good-bye to the international union of all civilized states; and although in some states, such as England, strangers can only be expelled by means of special acts of the legislative power, no state has renounced its right to expel them, as is shown by the alien bills which the government of England has at times used to invest itself with the right of expulsion." "Banishment is regulated by rules of expediency and humanity, and is a matter for the police of the state. No doubt the police can apprehend any foreigner who refuses to quit the country in

spite of authoritative orders to do so, and convey him to the frontier." Bar's International Law, (Gillespie's ed. 1883) 708 note, 711.

In the passages just quoted from Gillespie's translation of Bar, "banishment" is evidently used in the sense of expulsion or deportation by the political authority on the ground of expediency, and not in the sense of transportation or exile by way of punishment for crime. Strictly speaking, "transportation," "extradition" and "deportation," although each has the effect of removing a person from the country, are different things, and have different purposes. "Transportation" is by way of punishment of one convicted of an offence against the laws of the country. "Extradition" is the surrender to another country of one accused of an offence against its laws, there to be tried, and, if found guilty, punished. "Deportation" is the removal of an alien out of the country, simply because his presence is deemed inconsistent with the public welfare, and without any punishment being imposed or contemplated, either under the laws of the country out of which he is sent, or under those of the country to which he is taken.

In England, the only question that has ever been made in regard to the power to expel aliens has been whether it could be exercised by the King without the consent of Parliament. It was formerly exercised by the King, but in later times by Parliament, which passed several acts on the subject between 1793 and 1848. 2 Inst. 57; 1 Chalmers Opinions, 26; 1 Bl. Com. 260; Chitty on the Prerogative, 49; 1 Phillimore, c. 10, § 220 and note; 30 Parl. Hist. 157, 167, 188, 217, 229; 34 Hansard Parl. Deb. (1st series) 441, 445, 471, 1065–1071; 6 Law Quart. Rev. 27.

Eminent English judges, sitting in the Judicial Committee of the Privy Council, have gone very far in supporting the exclusion or expulsion, by the executive authority of a colony, of aliens having no absolute right to enter its territory or to remain therein.

In 1837, in a case arising in the Island of Mauritius, which had been conquered by Great Britain from France in 1810, and in which the law of France continued in force, Lord

Lyndhurst, Lord Brougham and Justices Bosanquet and Erskine, although considering it a case of great hardship, sustained the validity of an order of the English governor, deporting a friendly alien who had long resided and carried on business in the island, and had enjoyed the privileges and exercised the rights of a person duly domiciled, but who had not, as required by the French law, obtained from the colonial government formal and express authority to establish a domicil there. *In re Adam*, 1 Moore P. C. 460.

In a recent appeal from a judgment of the Supreme Court of the Colony of Victoria, a collector of customs, sued by a Chinese immigrant for preventing him from landing in the colony, had pleaded a justification under the order of a colonial minister claiming to exercise an alleged prerogative of the Crown to exclude alien friends, and denied the right of a court of law to examine his action, on the ground that what he had done was an act of state; and the plaintiff had demurred to the plea. Lord Chancellor Halsbury, speaking for himself, for Lord Herschell (now Lord Chancellor) and for other lords, after deciding against the plaintiff on a question of statutory construction, took occasion to observe: " The facts appearing on the record raise, quite apart from the statutes referred to, a grave question as to the plaintiff's right to maintain the action. He can only do so if he can establish that an alien has a legal right, enforceable by action, to enter British territory. No authority exists for the proposition that an alien has any such right. Circumstances may occur in which the refusal to permit an alien to land might be such an interference with international comity as would properly give rise to diplomatic remonstrance from the country of which he was a native ; but it is quite another thing to assert that an alien, excluded from any part of her Majesty's dominions by the executive government there, can maintain an action in a British court, and raise such questions as were argued before their lordships on the present appeal — whether the proper officer for giving or refusing access to the country has been duly authorized by his own colonial government, whether the colonial government has received sufficient delegated authority

from the Crown to exercise the authority which the Crown had a right to exercise through the colonial government if properly communicated to it, and whether the Crown has the right without parliamentary authority to exclude an alien. Their lordships cannot assent to the proposition that an alien refused permission to enter British territory can, in an action in a British court, compel the decision of such matters as these, involving delicate and difficult constitutional questions affecting the respective rights of the Crown and Parliament, and the relations of this country to her self-governing colonies. When once it is admitted that there is no absolute and unqualified right of action on behalf of an alien refused admission to British territory, their lordships are of opinion that it would be impossible, upon the facts which the demurrer admits, for an alien to maintain an action." *Musgrove* v. *Chun Teeong Toy*, App. Cas. (1891) 272, 282, 283.

The right to exclude or to expel all aliens, or any class of aliens, absolutely or upon certain conditions, in war or in peace, being an inherent and inalienable right of every sovereign and independent nation, essential to its safety, its independence and its welfare, the question now before the court is whether the manner in which Congress has exercised this right in sections 6 and 7 of the act of 1892 is consistent with the Constitution.

The United States are a sovereign and independent nation, and are vested by the Constitution with the entire control of international relations, and with all the powers of government necessary to maintain that control and to make it effective. The only government of this country, which other nations recognize or treat with, is the government of the Union; and the only American flag known throughout the world is the flag of the United States.

The Constitution of the United States speaks with no uncertain sound upon this subject. That instrument, established by the people of the United States as the fundamental law of the land, has conferred upon the President the executive power; has made him the commander-in-chief of the army and navy; has authorized him, by and with the consent of the

Senate, to make treaties, and to appoint ambassadors, public ministers and consuls; and has made it his duty to take care that the laws be faithfully executed. The Constitution has granted to Congress the power to regulate commerce with foreign nations, including the entrance of ships, the importation of goods and the bringing of persons into the ports of the United States; to establish a uniform rule of naturalization; to define and punish piracies and felonies committed on the high seas, and offences against the law of nations; to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water; to raise and support armies, to provide and maintain a navy, and to make rules for the government and regulation of the land and naval forces; and to make all laws necessary and proper for carrying into execution these powers, and all other powers vested by the Constitution in the government of the United States, or in any department or officer thereof. And the several States are expressly forbidden to enter into any treaty, alliance or confederation; to grant letters of marque and reprisal; to enter into any agreement or compact with another State, or with a foreign power; or to engage in war, unless actually invaded, or in such imminent danger as will not admit of delay.

In exercising the great power which the people of the United States, by establishing a written Constitution as the supreme and paramount law, have vested in this court, of determining, whenever the question is properly brought before it, whether the acts of the legislature or of the executive are consistent with the Constitution, it behooves the court to be careful that it does not undertake to pass upon political questions, the final decision of which has been committed by the Constitution to the other departments of the government.

As long ago said by Chief Justice Marshall, and since constantly maintained by this court: " The sound construction of the Constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the

manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the Constitution, are constitutional." " Where the law is not prohibited, and is really calculated to effect any of the objects intrusted to the government, to undertake here to inquire into the degree of its necessity would be to pass the line which circumscribes the judicial department, and to tread on legislative ground. This court disclaims all pretensions to such a power." *McCulloch* v. *Maryland,* 4 Wheat. 316, 421, 423 ; *Juilliard* v. *Greenman,* 110 U. S. 421, 440, 450 ; *Ex parte Yarbrough,* 110 U. S: 651, 658 ; *In re Rapier,* 143 U. S. 110, 134 ; *Logan* v. *United States,* 144 U. S. 263, 283.

The power to exclude or to expel aliens, being a power affecting international relations, is vested in the political departments of the government, and is to be regulated by treaty or by act of Congress, and to be executed by the executive authority according to the regulations so established, except so far as the judicial department has been authorized by treaty or by statute, or is required by the paramount law of the Constitution, to intervene.

In *Nishimura Ekiu's case,* it was adjudged that, although Congress might, if it saw fit, authorize the courts to investigate and ascertain the facts upon which the alien's right to land was made by the statutes to depend, yet Congress might intrust the final determination of those facts to an executive officer, and that, if it did so, his order was due process of law, and no other tribunal, unless expressly authorized by law to do so, was at liberty to reëxamine the evidence on which he acted, or to controvert its sufficiency. 142 U. S. 660.

The power to exclude aliens and the power to expel them rest upon one foundation, are derived from one source, are supported by the same reasons, and are in truth but parts of one and the same power.

The power of Congress, therefore, to expel, like the power to exclude aliens, or any specified class of aliens, from the

country, may be exercised entirely through executive officers; or Congress may call in the aid of the judiciary to ascertain any contested facts on which an alien's right to be in the country has been made by Congress to depend.

Congress, having the right, as it may see fit, to expel aliens of a particular class, or to permit them to remain, has undoubtedly the right to provide a system of registration and identification of the members of that class within the country, and to take all proper means to carry out the system which it provides.

It is no new thing for the law-making power, acting either through treaties made by the President and Senate, or by the more common method of acts of Congress, to submit the decision of questions, not necessarily of judicial cognizance, either to the final determination of executive officers, or to the decision of such officers in the first instance, with such opportunity for judicial review of their action as Congress may see fit to authorize or permit.

For instance, the surrender, pursuant to treaty stipulations, of persons residing or found in this country, and charged with crime in another, may be made by the executive authority of the President alone, when no provision has been made by treaty or by statute for an examination of the case by a judge or magistrate. Such was the case of Jonathan Robbins, under article 27 of the Treaty with Great Britain of 1794, in which the President's power in this regard was demonstrated in the masterly and conclusive argument of John Marshall in the House of Representatives. 8 Stat. 129; Wharton's State Trials, 392; Bee, 286; 5 Wheat. appx. 3. But provision may be made, as it has been by later acts of Congress, for a preliminary examination before a judge or commissioner; and in such case the sufficiency of the evidence on which he acts cannot be reviewed by any other tribunal, except as permitted by statute. Act of August 12, 1848, c. 167, 9 Stat. 302; Rev. Stat. §§ 5270–5274; *Ex parte Metzger*, 5 How. 176; *Benson* v. *McMahon*, 127 U. S. 457; *In re Oteiza*, 136 U. S. 330.

So claims to recover back duties illegally exacted on imports may, if Congress so provides, be finally determined by the

Secretary of the Treasury. *Cary* v. *Curtis*, 3 How. 236; *Curtis* v. *Fiedler*, 2 Black, 461, 478, 479; *Arnson* v. *Murphy*, 109 U. S. 238, 240. But Congress may, as it did for long periods, permit them to be tried by suit against the collector of customs. Or it may, as by the existing statutes, provide for their determination by a board of general appraisers, and allow the decisions of that board to be reviewed by the courts in such particulars only as may be prescribed by law. Act of June 10, 1890, c. 407, §§ 14, 15, 25, 26 Stat. 137, 138, 141; *In re Fassett*, 142 U. S. 479, 486, 487; *Passavant* v. *United States*, 148 U. S. 214.

To repeat the careful and weighty words uttered by Mr. Justice Curtis, in delivering a unanimous judgment of this court upon the question what is due process of law: " To avoid misconstruction upon so grave a subject, we think it proper to state that we do not consider Congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty ; nor, on the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for judicial determination. At the same time, there are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which Congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." *Murray* v. *Hoboken Co.*, 18 How. 272, 284.

Before examining in detail the provisions of the act of 1892 now in question, it will be convenient to refer to the previous statutes, treaties and decisions upon this subject.

The act of Congress of July 27, 1868, c. 249, (reënacted in sections 1999–2001 of the Revised Statutes,) began with these recitals : " Whereas the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness; and whereas in the recognition of this principle this government has freely received emigrants from all nations, and invested them with the rights of citizenship." It then declared that

any order or decision of any officer of the United States to the contrary was inconsistent with the fundamental principles of this government; enacted that "all naturalized citizens of the United States, while in foreign states, shall be entitled to and shall receive from this government the same protection of persons and property that is accorded to native-born citizens in like situations and circumstances;" and made it the duty of the President to take measures to protect the rights in that respect of "any citizen of the United States." 15 Stat. 223, 224.

That act, like any other, is subject to alteration by Congress whenever the public welfare requires it. The right of protection which it confers is limited to citizens of the United States. Chinese persons not born in this country have never been recognized as citizens of the United States, nor authorized to become such under the naturalization laws. Rev. Stat. (2d ed.) §§ 2165, 2169; Acts of April 14, 1802, c. 28, 2 Stat. 153; May 26, 1824, c. 186, 4 Stat. 69; July 14, 1870, c. 254, § 7, 16 Stat. 256; February 18, 1875, c. 80, 18 Stat. 318; In re Ah Yup, 5 Sawyer, 155; Act of May 6, 1882, c. 126, § 14, 22 Stat. 61.

The treaty made between the United States and China on July 28, 1868, contained the following stipulations:

"ARTICLE V. The United States of America and the Emperor of China cordially recognize the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of the free migration and emigration of their citizens and subjects, respectively, from one country to the other, for purposes of curiosity, of trade, or as permanent residents."

"ARTICLE VI. Citizens of the United States visiting or residing in China," "and reciprocally, Chinese subjects visiting or residing in the United States, shall enjoy the same privileges, immunities and exemptions, in respect to travel or residence, as may there be enjoyed by the citizens or subjects of the most favored nation. But nothing herein contained shall be held to confer naturalization upon citizens of the United States in China, nor upon the subjects of China in the United States."

After some years' experience under that treaty, the gov-- ernment of the United States was brought to the opinion that the presence within our territory of large numbers of Chinese laborers, of a distinct race and religion, remaining strangers in the land, residing apart by themselves, tenaciously adher- ing to the customs and usages of their own country, unfamiliar with our institutions, and apparently incapable of assimilating with our people, might endanger good order, and be injurious to the public interests; and therefore requested and obtained from China a modification of the treaty. *Chew Heong* v. *United States*, 112 U. S. 536, 542, 543; *Chae Chan Ping* v. *United States*, 130 U. S. 581, 595, 596.

On November 17, 1880, a supplemental treaty was accord- ingly concluded between the two countries, which contained the following preamble and stipulations:

"Whereas the government of the United States, because of the constantly increasing immigration of Chinese laborers to the territory of the United States, and the embarrassments consequent upon such immigration, now desires to negotiate a modification of the existing treaties which shall not be in direct contravention of their spirit:"

"ARTICLE I. Whenever, in the opinion of the government of the United States, the coming of the Chinese laborers to the United States, or their residence therein, affects or threatens to affect the interests of that country, or to endanger the good order of the said country, or of any locality within the territory thereof, the government of China agrees that the government of the United States may regulate, limit or suspend such coming or residence, but may not absolutely prohibit it. The limitation or suspension shall be reasonable, and shall apply only to Chinese who may go to the United States as laborers, other classes not being included in the limitations. Legislation taken in regard to Chinese laborers will be of such a character only as is necessary to enforce the regulation, limitation or suspension of immigra- tion, and immigrants shall not be subject to personal mal- treatment or abuse.

"ARTICLE II. Chinese subjects, whether proceeding to the

United States as teachers, students, merchants or from curiosity, together with their body and household servants, and Chinese laborers who are now in the United States, shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, immunities and exemptions which are accorded to the citizens and subjects of the most favored nation.

"ARTICLE III. If Chinese laborers, or Chinese of any other class now either permanently or temporarily residing in the territory of the United States, meet with ill treatment at the hands of any other persons, the government of the United States will exert all its power to devise measures for their protection, and to secure to them the same rights, privileges, immunities and exemptions as may be enjoyed by the citizens or subjects of the most favored nation, and to which they are entitled by treaty." 22 Stat. 826, 827.

The act of May 6, 1882, c. 126, entitled "An act to execute certain treaty stipulations relating to Chinese," and amended by the act of July 5, 1884, c. 220, began with the recital that, "in the opinion of the government of the United States, the coming of Chinese laborers to this country endangers the good order of certain localities within the territories thereof;" and, in section 1, suspended their coming for ten years, and enacted that it should "not be lawful for any Chinese laborer to come from any foreign port or place, or, having so come, to remain within the United States;" in section 3, that this provision should not apply to Chinese laborers who were in the United States on November 17, 1880, or who came here within ninety days after the passage of the act of 1882, and who should produce evidence of that fact, as afterwards required by the act, to the master of the vessel and to the collector of the port; and, in section 4, that "for the purpose of properly identifying Chinese laborers who were in the United States" at such time, "and in order to furnish them with the proper evidence of their right to go from and come to the United States," as provided by that act and by the treaty of November 17, 1880, the collector of customs of the district, from which any Chinese laborers should depart from

the United States by sea, should go on board the vessel, and make and register a list of them, with all facts necessary for their identity, and should give to each a corresponding certificate, which should entitle him "to return to and reënter the United States, upon producing and delivering the same to the collector of customs," to be cancelled. The form of certificate prescribed by the act of 1884 differed in some particulars from that prescribed by the act of 1882; and the act of 1884 added that "said certificate shall be the only evidence to establish his right of reëntry." Each act further enacted, in section 5, that any such Chinese laborer, being in the United States and desiring to depart by land, should be entitled to a like certificate of identity; and in section 12, that no Chinese person should be permitted to enter the United States by land, without producing such a certificate, and that "any Chinese person found unlawfully within the United States shall be caused to be removed therefrom to the country from whence he came, and at the cost of the United States, after being brought before some justice, judge or commissioner of a court of the United States, and found to be one not lawfully entitled to be or remain in the United States." The act of 1884 further enacted, in section 16, that a violation of any of the provisions of the act, the punishment of which was not therein otherwise provided for, should be deemed a misdemeanor, and be punishable by fine not exceeding $1000, or by imprisonment for not more than one year, or by both such fine and imprisonment. 22 Stat. 58–60; 23 Stat. 115–118.

Under those acts, this court held, in *Chew Heong* v. *United States*, 112 U. S. 536, that the clause of section 4 of the act of 1884, making the certificate of identity the only evidence to establish a right to reënter the United States, was not applicable to a Chinese laborer who resided in the United States at the date of the treaty of 1880, departed by sea before the passage of the act of 1882, remained out of the United States until after the passage of the act of 1884, and then returned by sea; and in *United States* v. *Yung Ah Lung*, 124 U. S. 621, that a Chinese laborer, who resided in the United

States at the date of the treaty of 1880, and until 1883, when he left San Francisco for China, taking with him a certificate of identity from the collector of the port in the form provided by the act of 1882, which was stolen from him in China, was entitled to land again in the United States in 1885, on proving by other evidence these facts, and his identity with the person described in the register kept by the collector of customs as the one to whom that certificate was issued.

Both those decisions proceeded upon a consideration of the various provisions of the acts of 1882 and 1884, giving weight to the presumption that they should not, unless unavoidably, be construed as operating retrospectively, or as contravening the stipulations of the treaty. In the first of those cases Justices Field and Bradley, and in the second case Justices Field, Harlan and Lamar, dissented from the judgment, being of opinion that the necessary construction of those acts was against the Chinese laborer. And in none of the opinions in either case was it suggested that the acts in question, if construed as contended by the United States, and so as to contravene the treaty, would be unconstitutional or inoperative.

In our jurisprudence, it is well settled that the provisions of an act of Congress, passed in the exercise of its constitutional authority, on this, as on any other subject, if clear and explicit, must be upheld by the courts, even in contravention of express stipulations in an earlier treaty. As was said by this court in *Chae Chan Ping's case,* following previous decisions: "The treaties were of no greater legal obligation than the act of Congress. By the Constitution, laws made in pursuance thereof and treaties made under the authority of the United States are both declared to be the supreme law of the land, and no paramount authority is given to one over the other. A treaty, it is true, is in its nature a contract between nations, and is often merely promissory in its character, requiring legislation to carry its stipulations into effect. Such legislation will be open to future repeal or amendment. If the treaty operates by its own force, and relates to a subject within the power of Congress, it can be deemed in that particular only the equivalent of a legislative act, to be repealed or modi-

fied at the pleasure of Congress. In either case, the last expression of the sovereign will must control." "So far as a treaty made by the United States with any foreign nation can become the subject of judicial cognizance in the courts of this country, it is subject to such acts as Congress may pass for its enforcement, modification or repeal." 130 U. S. 600: See also *Foster* v. *Neilson*, 2 Pet. 253, 314; *Edye* v. *Robertson*, 112 U. S. 580, 597–599; *Whitney* v. *Robertson*, 124 U. S. 190.

By the supplementary act of October 1, 1888, c. 1064, it was enacted, in section 1, that "from and after the passage of this act, it shall be unlawful for any Chinese laborer, who shall at any time heretofore have been, or who may now or hereafter be, a resident within the United States, and who shall have departed or shall depart therefrom, and shall not have returned before the passage of this act, to return to, or remain in, the United States;" and in section 2, that "no certificates of identity, provided for in the fourth and fifth sections of the act to which this is a supplement, shall hereafter be issued; and every certificate heretofore issued in pursuance thereof is hereby declared void and of no effect, and the Chinese laborer claiming admission by virtue thereof shall not be permitted to enter the United States." 25 Stat. 504.

In the case of *Chae Chan Ping*, already often referred to, a Chinese laborer, who had resided in San Francisco from 1875 until June 2, 1887, when he left that port for China, having in his possession a certificate issued to him on that day by the collector of customs, according to the act of 1884, and in terms entitling him to return to the United States, returned to the same port on October 8, 1888, and was refused by the collector permission to land, because of the provisions of the act of October 1, 1888, above cited. It was strongly contended in his behalf, that by his residence in the United States for twelve years preceding June 2, 1887, in accordance with the fifth article of the treaty of 1868, he had now a lawful right to be in the United States, and had a vested right to return to the United States, which could not be taken from him by any exercise of mere legislative power by Con-

gress; that he had acquired such a right by contract between him and the United States, by virtue of his acceptance of the offer, contained in the acts of 1882 and 1884, to every Chinese person then here, if he should leave the country, complying with specified conditions, to permit him to return; that, as applied to him, the act of 1888 was unconstitutional, as being a bill of attainder and an *ex post facto* law; and that the depriving him of his right to return was punishment, which could not be inflicted except by judicial sentence. The contention was thus summed up at the beginning of the opinion: "The validity of the act is assailed as being in effect an expulsion from the country of Chinese laborers, in violation of existing treaties between the United States and the government of China, and of rights vested in them under the laws of Congress." 130 U. S. 584–589.

Yet the court unanimously held that the statute of 1888 was constitutional, and that the action of the collector in refusing him permission to land was lawful; and, after the passages already quoted, said: "The power of exclusion of foreigners being an incident of sovereignty belonging to the government of the United States, as a part of those sovereign powers delegated by the Constitution, the right to its exercise at any time when, in the judgment of the government, the interests of the country require it, cannot be granted away or restrained on behalf of any one. The powers of government are delegated in trust to the United States, and are incapable of transfer to any other parties. They cannot be abandoned or surrendered. Nor can their exercise be hampered, when needed for the public good, by any considerations of private interest. The exercise of these public trusts is not the subject of barter or contract. Whatever license, therefore, Chinese laborers may have obtained, previous to the act of October 1, 1888, to return to the United States after their departure, is held at the will of the government, revocable at any time, at its pleasure." "The rights and interests created by a treaty, which have become so vested that its expiration or abrogation will not destroy or impair them, are such as are connected with and lie in property, capable of sale and transfer or other

disposition, not such as are personal and untransferable in their character." "But far different is this case, where a continued suspension of the exercise of a governmental power is insisted upon as a right, because, by the favor and consent of the government, it has not heretofore been exerted with respect to the appellant or to the class to which he belongs. Between property rights not affected by the termination or abrogation of a treaty, and expectations of benefits from the continuance of existing legislation, there is as wide a difference as between realization and hopes." 130 U. S. 609, 610.

It thus appears that in that case it was directly adjudged, upon full argument and consideration, that a Chinese laborer, who had been admitted into the United States while the treaty of 1868 was in force, by which the United States and China " cordially recognize the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of the free migration and emigration of their citizens and subjects, respectively, from one country to the other," not only for the purpose of curiosity or of trade, but " as permanent residents;" and who had continued to reside here for twelve years, and who had then gone back to China, after receiving a certificate, in the form provided by act of Congress, entitling him to return to the United States; might be refused re-admission into the United States, without judicial trial or hearing, and simply by reason of another act of Congress, passed during his absence, and declaring all such certificates to be void, and prohibiting all Chinese laborers who had at any time been residents in the United States, and had departed therefrom and not returned before the passage of this act, from coming into the United States.

In view of that decision, which, as before observed, was a unanimous judgment of the court, and which had the concurrence of all the justices who had delivered opinions in the cases arising under the acts of 1882 and 1884, it appears to be impossible to hold that a Chinese laborer acquired, under any of the treaties or acts of Congress, any right, as a denizen or otherwise, to be and remain in this country, except by the license, permission and sufferance of Congress, to be with-

drawn whenever, in its opinion, the public welfare might require it.

By the law of nations, doubtless, aliens residing in a country, with the intention of making it a permanent place of abode, acquire, in one sense, a domicil there; and, while they are permitted by the nation to retain such a residence and domicil, are subject to its laws, and may invoke its protection against other nations. This is recognized by those publicists who, as has been seen, maintain in the strongest terms the right of the nation to expel any or all aliens at its pleasure. Vattel, lib. 1, c. 19, § 213; 1 Phillimore, c. 18, § 321; Mr. Marcy, in *Koszta's case*, Wharton's International Law Digest, § 198. See also *Lau Ow Bew v. United States*, 144 U. S. 47, 62; Merlin, Repertoire de Jurisprudence, Domicile, § 13, quoted in the case, above cited, of *In re Adam*, 1 Moore P. C. 460, 472, 473.

Chinese laborers, therefore, like all other aliens residing in the United States for a shorter or longer time, are entitled, so long as they are permitted by the government of the United States to remain in the country, to the safeguards of the Constitution, and to the protection of the laws, in regard to their rights of person and of property, and to their civil and criminal responsibility. But they continue to be aliens, having taken no steps towards becoming citizens, and incapable of becoming such under the naturalization laws; and therefore remain subject to the power of Congress to expel them, or to order them to be removed and deported from the country, whenever in its judgment their removal is necessary or expedient for the public interest.

Nothing inconsistent with these views was decided or suggested by the court in *Chy Lung v. Freeman*, 92 U. S. 275, or in *Yick Wo v. Hopkins*, 118 U. S. 356, cited for the appellants.

In *Chy Lung v. Freeman*, a statute of the State of California, restricting the immigration of Chinese persons, was held to be unconstitutional and void, because it contravened the grant in the Constitution to Congress of the power to regulate commerce with foreign nations.

In *Yick Wo* v. *Hopkins*, the point decided was that the Fourteenth Amendment of the Constitution of the United States, forbidding any State to deprive any person of life, liberty or property without due process of law, or to deny to any person within its jurisdiction the equal protection of the laws, was violated by a municipal ordinance of San Francisco, which conferred upon the board of supervisors arbitrary power, without regard to competency of persons or to fitness of places, to grant or refuse licenses to carry on public laundries, and which was executed by the supervisors by refusing licenses to all Chinese residents, and granting them to other persons under like circumstances. The question there was of the power of a State over aliens continuing to reside within its jurisdiction, not of the power of the United States to put an end to their residence in the country.

The act of May 5, 1892, c. 60, is entitled "An act to prohibit the coming of Chinese persons into the United States"; and provides, in section 1, that "all laws now in force, prohibiting and regulating the coming into this country of Chinese persons and persons of Chinese descent, are hereby continued in force for a period of ten years from the passage of this act."

The rest of the act (laying aside, as immaterial, section 5, relating to an application for a writ of *habeas corpus* "by a Chinese person seeking to land in the United States, to whom that privilege has been denied,") deals with two classes of Chinese persons, first, those "not lawfully entitled to be or remain in the United States," and second, those "entitled to remain in the United States." These words of description neither confer nor take away any right; but simply designate the Chinese persons who were not, or who were, authorized or permitted to remain in the United States under the laws and treaties existing at the time of the passage of this act, but subject, nevertheless, to the power of the United States, absolutely or conditionally, to withdraw the permission and to terminate the authority to remain.

Sections 2–4 concern Chinese "not lawfully entitled to be or remain in the United States;" and provide that, after trial

before a justice, judge or commissioner, a "Chinese person, or person of Chinese descent, convicted and adjudged to be not lawfully entitled to be or remain in the United States," shall be imprisoned at hard labor for not more than a year, and be afterwards removed to China or other country of which he appears to be a citizen or subject.

The subsequent sections relate to Chinese laborers "entitled to remain in the United States" under previous laws. Sections 6 and 7 are the only sections which have any bearing on the cases before us, and the only ones, therefore, the construction or effect of which need now be considered.

The manifest objects of these sections are to provide a system of registration and identification of such Chinese laborers, to require them to obtain certificates of residence, and, if they do not do so within a year, to have them deported from the United States.

Section 6, in the first place, provides that "it shall be the duty of all Chinese laborers, within the limits of the United States at the time of the passage of this act, and who are entitled to remain in the United States, to apply to the collector of internal revenue of their respective districts, within one year after the passage of this act, for a certificate of residence." This provision, by making it the duty of the Chinese laborer to apply to the collector of internal revenue of the district for a certificate, necessarily implies a correlative duty of the collector to grant him a certificate, upon due proof of the requisite facts. What this proof shall be is not defined in the statute, but is committed to the supervision of the Secretary of the Treasury by section 7, which directs him to make such rules and regulations as may be necessary for the efficient execution of the act, to prescribe the necessary forms, and to make such provisions that certificates may be procured in localities convenient to the applicants, and without charge to them; and the Secretary of the Treasury has, by such rules and regulations, provided that the fact of residence shall be proved by "at least one credible witness of good character," or, in case of necessity, by other proof. The statute and the regulations, in order to make sure that every such Chinese

laborer may have a certificate, in the nature of a passport, with which he may go into any part of the United States, and that the United States may preserve a record of all such certificates issued, direct that a duplicate of each certificate shall be recorded in the office of the collector who granted it, and may be issued to the laborer upon proof of loss or destruction of his original certificate. There can be no doubt of the validity of these provisions and regulations, unless they are invalidated by the other provisions of section 6.

This section proceeds to enact that any Chinese laborer within the limits of the United States, who shall neglect, fail or refuse to apply for a certificate of residence within the year, or who shall afterwards be found within the jurisdiction of the United States without such a certificate, "shall be deemed and adjudged to be unlawfully within the United States." The meaning of this clause, as shown by those which follow, is not that this fact shall thereupon be held to be conclusively established against him, but only that the want of a certificate shall be *prima facie* evidence that he is not entitled to remain in the United States; for the section goes on to direct that he "may be arrested by any customs official, collector of internal revenue or his deputies, United States marshal or his deputies, and taken before a United States judge;" and that it shall thereupon be the duty of the judge to order that the laborer "be deported from the United States" to China, (or to any other country which he is a citizen or subject of, and which does not demand any tax as a condition of his removal to it,) "unless he shall establish clearly, to the satisfaction of said judge, that by reason of accident, sickness or other unavoidable cause, he has been unable to procure his certificate, and to the satisfaction of the court, and by at least one credible white witness, that he was a resident of the United States at the time of the passage of this act; and if, upon the hearing, it shall appear that he is so entitled to a certificate, it shall be granted upon his paying the cost. Should it appear that said Chinaman had procured a certificate which has been lost or destroyed, he shall be detained and judgment suspended a reasonable time to enable him to procure a duplicate from the

officer granting it; and in such cases the cost of said arrest and trial shall be in the discretion of the court."

For the reasons stated in the earlier part of this opinion, Congress, under the power to exclude or expel aliens, might have directed any Chinese laborer, found in the United States without a certificate of residence, to be removed out of the country by executive officers, without judicial trial or examination, just as it might have authorized such officers absolutely to prevent his entrance into the country. But Congress has not undertaken to do this.

The effect of the provisions of section 6 of the act of 1892 is that, if a Chinese laborer, after the opportunity afforded him to obtain a certificate of residence within a year, at a convenient place, and without cost, is found without such a certificate, he shall be so far presumed to be not entitled to remain within the United States, that an officer of the customs, or a collector of internal revenue, or a marshal, or a deputy of either, may arrest him, not with a view to imprisonment or punishment, or to his immediate deportation without further inquiry, but in order to take him before a judge, for the purpose of a judicial hearing and determination of the only facts which, under the act of Congress, can have a material bearing upon the question whether he shall be sent out of the country, or be permitted to remain.

The powers and duties of the executive officers named being ordinarily limited to their own districts, the reasonable inference is that they must take him before a judge within the same judicial district; and such was the course pursued in the cases before us.

The designation of the judge, in general terms, as "a United States judge," is an apt and sufficient description of a judge of a court of the United States, and is equivalent to or synonymous with the designation, in other statutes, of the judges authorized to issue writs of *habeas corpus*, or warrants to arrest persons accused of crime. Rev. Stat. §§ 752, 1014.

When, in the form prescribed by law, the executive officer, acting in behalf of the United States, brings the Chinese laborer before the judge, in order that he may be heard, and

the facts upon which depends his right to remain in the country be decided, a case is duly submitted to the judicial power; for here are all the elements of a civil case — a complainant, a defendant and a judge — *actor, reus et judex.* 3 Bl. Com. 25; *Osborn* v. *Bank of United States,* 9 Wheat. 738, 819. No formal complaint or pleadings are required, and the want of them does not affect the authority of the judge, or the validity of the statute.

If no evidence is offered by the Chinaman, the judge makes the order of deportation, as upon a default. If he produces competent evidence to explain the fact of his not having a certificate, it must be considered by the judge; and if he thereupon appears to be entitled to a certificate, it is to be granted to him. If he proves that the collector of internal revenue has unlawfully refused to give him a certificate, he proves an "unavoidable cause," within the meaning of the act, for not procuring one. If he proves that he had procured a certificate which has been lost or destroyed, he is to be allowed a reasonable time to procure a duplicate thereof.

The provision which puts the burden of proof upon him of rebutting the presumption arising from his having no certificate, as well as the requirement of proof, " by at least one credible white witness, that he was a resident of the United States at the time of the passage of this act," is within the acknowledged power of every legislature to prescribe the evidence which shall be received, and the effect of that evidence, in the courts of its own government. *Odgen* v. *Saunders,* 12 Wheat. 213, 262, 349; *Pillow* v. *Roberts,* 13 How. 472, 476; *Cliquot's Champagne,* 3 Wall. 114, 143; *Ex parte Fisk,* 113 U. S. 713, 721; *Holmes* v. *Hunt,* 122 Mass. 505, 516–519. The competency of all witnesses, without regard to their color, to testify in the courts of the United States, rests on acts of Congress, which Congress may at its discretion modify or repeal. Rev. Stat. §§ 858, 1977. The reason for requiring a Chinese alien, claiming the privilege of remaining in the United States, to prove the fact of his residence here, at the time of the passage of the act, " by at least one credible white witness," may have been the experience of Congress, as

mentioned by Mr. Justice Field in *Chae Chan Ping's case*, that the enforcement of former acts, under which the testimony of Chinese persons was admitted to prove similar facts, " was attended with great embarrassment, from the suspicious nature, in many instances, of the testimony offered to establish the residence of the parties, arising from the loose, notions entertained by the witnesses of the obligation of an oath." 130 U. S. 598. And this requirement, not allowing such a fact to be proved solely by the testimony of aliens in a like situation, or of the same race, is quite analogous to the provision, which has existed for seventy-seven years in the naturalization laws, by which aliens applying for naturalization must prove their residence within the limits and under the jurisdiction of the United States, for five years next preceding, " by the oath or affirmation of citizens of the United States." Acts of March 22, 1816, c. 32, § 2, 3 Stat. 259; May 24, 1828, c. 116, § 2, 4 Stat. 311; Rev. Stat. § 2165, cl. 6; 2 Kent Com. 65.

The proceeding before a United States judge, as provided for in section 6 of the act of 1892, is in no proper sense a trial and sentence for a crime or offence. It is simply the ascertainment, by appropriate and lawful means, of the fact whether the conditions exist upon which Congress has enacted that an alien of this class may remain within the country. The order of deportation is not a punishment for crime. It is not a banishment, in the sense in which that word is often applied to the expulsion of a citizen from his country by way of punishment. It is but a method of enforcing the return to his own country of an alien who has not complied with the conditions upon the performance of which the government of the nation, acting within its constitutional authority and through the proper departments, has determined that his continuing to reside here shall depend. He has not, therefore, been deprived of life, liberty or property, without due process of law; and the provisions of the Constitution, securing the right of trial by jury, and prohibiting unreasonable searches and seizures, and cruel and unusual punishments, have no application.

The question whether, and upon what conditions, these aliens shall be permitted to remain within the United States being one to be determined by the political departments of the government, the judicial department cannot properly express an opinion upon the wisdom, the policy or the justice of the measures enacted by Congress in the exercise of the powers confided to it by the Constitution over this subject.

The three cases now before us do not differ from one another in any material particular.

In the first case, the petitioner had wholly neglected, failed and refused to apply to the collector of internal revenue for a certificate of residence, and, being found without such a certificate after a year from the passage of the act of 1892, was arrested by the United States marshal, with the purpose, as the return states, of taking him before a United States judge within the district; and thereupon, before any further proceeding, sued out a writ of *habeas corpus.*

In the second case, the petitioner had likewise neglected, failed and refused to apply to the collector of internal revenue for a certificate of residence, and, being found without one, was arrested by the marshal and taken before the District Judge of the United States, who ordered him to be remanded to the custody of the marshal, and to be deported from the United States, in accordance with the provisions of the act. The allegation in the petition, that the judge's order was made " without any hearing of any kind," is shown to be untrue by the recital in the order itself, (a copy of which is annexed to and made part of the petition,) that he had failed to clearly establish to the judge's satisfaction that by reason of accident, sickness or other unavoidable cause, he had been unable to procure a certificate, or that he had procured one and it had been lost or destroyed.

In the third case, the petitioner had, within the year, applied to a collector of internal revenue for a certificate of residence, and had been refused it, because he produced and could produce none but Chinese witnesses to prove the residence necessary to entitle him to a certificate. Being found without a certificate of residence, he was arrested by the

marshal, and taken before the United States District Judge, and established to the satisfaction of the judge, that, because of the collector's refusal to give him a certificate of residence he was without one by unavoidable cause; and also proved, by a Chinese witness only, that he was a resident of the United States at the time of the passage of the act of 1892. Thereupon the judge ordered him to be remanded to the custody of the marshal, and to be deported from the United States, as provided in that act.

It would seem that the collector of internal revenue, when applied to for a certificate, might properly decline to find the requisite fact of residence upon testimony which, by an express provision of the act, would be insufficient to prove that fact at a hearing before the judge. But if the collector might have received and acted upon such testimony, and did, upon any ground, unjustifiably refuse a certificate of residence, the only remedy of the applicant was to prove by competent and sufficient evidence at the hearing before the judge the facts requisite to entitle him to a certificate. To one of those facts, that of residence, the statute, which, for the reasons already stated, appears to us to be within the constitutional authority of Congress to enact, peremptorily requires at that hearing the testimony of a credible white witness. And it was because no such testimony was produced, that the order of deportation was made.

Upon careful consideration of the subject, the only conclusion which appears to us to be consistent with the principles of international law, with the Constitution and laws of the United States, and with the previous decisions of this court, is that in each of these cases the judgment of the Circuit Court, dismissing the writ of *habeas corpus*, is right and must be

*Affirmed.*

MR. JUSTICE BREWER dissenting.

I dissent from the opinion and judgment of the court in these cases, and the questions being of importance, I deem it not improper to briefly state my reasons therefor.

I rest my dissent on three propositions: First, that the persons against whom the penalties of section 6 of the act of 1892 are directed are persons lawfully residing within the United States; secondly, that as such they are within the protection of the Constitution, and secured by its guarantees against oppression and wrong; and, third, that section 6 deprives them of liberty and imposes punishment without due process of law, and in disregard of constitutional guarantees, especially those found in the Fourth, Fifth, Sixth, and Eighth Articles of the Amendments.

And, first, these persons are lawfully residing within the limits of the United States. By the treaty of July 28, 1868, 16 Stat. 739, 740, commonly known as the "Burlingame Treaty," it was provided, article 5: "The United States of America and the Emperor of China cordially recognize the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of the free migration and emigration of their citizens and subjects, respectively, from the one country to the other, for purposes of curiosity, of trade, or as permanent residents." And article 6: "Citizens of the United States visiting or residing in China shall enjoy the same privileges, immunities, or exemptions in respect to travel or residence, as may there be enjoyed by the citizens or subjects of the most favored nation. And, reciprocally, Chinese subjects visiting or residing in the United States shall enjoy the same privileges, immunities, and exemptions in respect to travel or residence, as may there be enjoyed by the citizens or subjects of the most favored nation." At that time we sought Chinese emigration. The subsequent treaty of November 17, 1880, 22 Stat. 826, which looked to a restriction of Chinese emigration, nevertheless contained in article 2 this provision:

"ARTICLE II. Chinese subjects, whether proceeding to the United States as teachers, students, merchants, or from curiosity, together with their body and household servants, and Chinese laborers who are now in the United States shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, immunities,

and exemptions which are accorded to the citizens and subjects of the most favored nation."

While subsequently to this treaty, Congress passed several acts — May 6, 1882, 22 Stat. 58, c. 126; July 5, 1884, 23 Stat. 115, c. 220; October 1, 1888, 25 Stat. 504, c. 1064 — to restrict the entrance into this country of Chinese laborers, and while the validity of this restriction was sustained in the *Chinese Exclusion case*, 130 U. S. 581, yet no act has been passed denying the right of those laborers who had once lawfully entered the country to remain, and they are here not as travellers or only temporarily. We must take judicial notice of that which is disclosed by the census, and which is also a matter of common knowledge. There are 100,000 and more of these persons living in this country, making their homes here, and striving by their labor to earn a livelihood. They are not travellers, but resident aliens.

But, further, this section six recognizes the fact of a lawful residence, and only applies to those who have such; for the parties named in the section, and to be reached by its provisions, are " Chinese laborers within the limits of the United States at the time of the passage of this act, and who are entitled to remain in the United States." These appellants, therefore, are lawfully within the United States, and are here as residents, and not as travellers. They have lived in this country, respectively, since 1879, 1877, and 1874 — almost as long a time as some of those who were members of the Congress that passed this act of punishment and expulsion.

That those who have become domiciled in a country are entitled to a more distinct and larger measure of protection than those who are simply passing through, or temporarily in it, has long been recognized by the law of nations. It was said by this court, in the case of *The Venus*, 8 Cranch, 253, 278: " The writers upon the law of nations distinguish between a temporary residence in a foreign country, for a special purpose, and a residence accompanied with an intention to make it a permanent place of abode. The latter is styled by Vattel, *domicil*, which he defines to be 'a habitation fixed in any place, with an intention of always staying there.' Such

a person, says this author, becomes a member of the new society, at least as a permanent inhabitant, and is a kind of citizen of an inferior order from the native citizens; but is, nevertheless, united and subject to the society, without participating in all its advantages. This right of domicil, he continues, is not established, unless the person makes sufficiently known his intention of fixing there, either tacitly or by an express declaration. (Vatt. pp. 92, 93.) Grotius nowhere uses the word *domicil*, but he also distinguishes between those who stay in a foreign country by the necessity of their affairs, or from any other temporary cause, and those who reside there from a permanent cause. The former he denominates strangers, and the latter subjects." The rule is thus laid down by Sir Robert Phillimore: " It has been said that these rules of law are applicable to naturalized as well as native citizens. But there is a class of persons which cannot be, strictly speaking, included under either of these denominations, namely, the class of those who have ceased to reside in their native country, and have taken up a permanent abode . . . . in another. These are domiciled inhabitants; they have not put on a new citizenship through some formal mode enjoined by the law of the new country. They are *de facto* though not *de jure* citizens of the country of their domicil." 1 Phillimore, International Law, Chap. XVIII, p. 347.

In the *Koszta case* it was said by Secretary Marcy: " This right to protect persons having a domicil, though not native-born or naturalized citizens, rests on the firm foundation of justice, and the claim to be protected is earned by considerations which the protecting power is not at liberty to disregard. Such domiciled citizen pays the same price for his protection as native-born or naturalized citizens pay for theirs. He is under the bonds of allegiance to the country of his residence, and if he breaks them incurs the same penalties; he owes the same obedience to the civil laws . . .; his property is in the same way and to the same extent as theirs liable to contribute to the support of the government. . . . In nearly all respects his and their condition as to the duties and burdens of government are undistinguishable." 2 Wharton Int. Law Digest, § 198.

And in *Lau Ow Bew* v. *United States*, 144 U. S. 47, 61, this court declared that " by general international law, foreigners who have become domiciled in a country other than their own, acquire rights and must discharge duties in many respects the same as possessed by and imposed upon the citizens of that country, and no restriction on the footing upon which such persons stand by reason of their domicil, . . . is to be presumed."

Indeed, there is force in the contention of counsel for appellants, that these persons are " denizens " within the true meaning and spirit of that word as used in the common law. The old definition was this:

" A denizen of England by letters patent for life, in tayl or in fee, whereby he becomes a subject in regard of his person." *Craw* v. *Ramsey*, Vaughan's Reports, 278.

And again:

" A denizen is an alien born, but who has obtained *ex donatione regis* letters patent to make him an English subject, . . . A denizen is in a kind of middle state, between an alien and a natural-born subject, and partakes of both of them." 1 Bl. Com. 374.

In respect to this, after quoting from some of the early constitutions of the States, in which the word " denizen " is found, counsel say: " It is claimed that the appellants in this case come completely within the definition quoted above. They are alien born, but they have obtained the same thing as letters patent from this country. They occupy a middle state between an alien and a native. They partake of both of them. They cannot vote, or, as it is stated in Bacon's Abridgment, they have no ' power of making laws,' as a native-born subject can, nor are they here as ordinary aliens. An ordinary alien within this country has come here under no prohibition, and no invitation, but the appellants have come under the direct request and invitation and under the ' patent' of the Federal government. They have been guaranteed ' the same privileges, immunities, and exemptions in respect to . . . residence' (Burlingame Treaty concluded July 28, 1868) as that enjoyed in the United States by the citizens and

subjects of the most favored nation. They have been told that if they would come here they would be treated just the same as we treat an Englishman, an Irishman, or a Frenchman. They have been invited here, and their position is much stronger than that of an alien, in regard to whom there is no guarantee from the government, and who has come not in response to any invitation, but has simply drifted here because there is no prohibition to keep him out. They certainly come within the meaning of ' denizen' as used in the constitutions of the States."

But whatever rights a resident alien might have in any other nation, here he is within the express protection of the Constitution, especially in respect to those guarantees which are declared in the original amendments. It has been repeated so often as to become axiomatic, that this government is one of enumerated and delegated powers, and, as declared in Article 10 of the amendments, "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

It is said that the power here asserted is inherent in sovereignty. This doctrine of powers inherent in sovereignty is one both indefinite and dangerous. Where are the limits to such powers to be found, and by whom are they to be pronounced? Is it within legislative capacity to declare the limits? If so, then the mere assertion of an inherent power creates it, and despotism exists. May the courts establish the boundaries? Whence do they obtain the authority for this? Shall they look to the practices of other nations to ascertain the limits? The governments of other nations have elastic powers — ours is fixed and bounded by a written constitution. The expulsion of a race may be within the inherent powers of a despotism. History, before the adoption of this Constitution, was not destitute of examples of the exercise of such a power; and its framers were familiar with history, and wisely, as it seems to me, they gave to this government no general power to banish. Banishment may be resorted to as punishment for crime; but

among the powers reserved to the people and not delegated to the government is that of determining whether whole classes in our midst shall, for no crime but that of their race and birthplace, be driven from our territory.

Whatever may be true as to exclusion, and as to that see *Chinese Exclusion case*, 130 U. S. 581, and *Nishimura Ekiu v. United States*, 142 U. S. 651, I deny that there is any arbitrary and unrestrained power to banish residents, even resident aliens. What, it may be asked, is the reason for any difference? The answer is obvious. The Constitution has no extraterritorial effect, and those who have not come lawfully within our territory cannot claim any protection from its provisions. And it may be that the national government, having full control of all matters relating to other nations, has the power to build, as it were, a Chinese wall around our borders and absolutely forbid aliens to enter. But the Constitution has potency everywhere within the limits of our territory, and the powers which the national government may exercise within such limits are those, and only those, given to it by that instrument. Now, the power to remove resident aliens is, confessedly, not expressed. Even if it be among the powers implied, yet still it can be exercised only in subordination to the limitations and restrictions imposed by the Constitution. In the case of *Monongahela Navigation Company v. United States*, 148 U. S. 312, 336, it was said: "But like the other powers granted to Congress by the Constitution, the power to regulate commerce is subject to all the limitations imposed by such instrument, and among them is that of the Fifth Amendment we have heretofore quoted. Congress has supreme control over the regulation of commerce; but if, in exercising that supreme control, it deems it necessary to take private property, then it must proceed subject to the limitations imposed by this Fifth Amendment, and can take only on payment of just compensation." And if that be true of the powers expressly granted, it must as certainly be true of those that are only granted by implication.

When the first ten amendments were presented for adoption

they were preceded by a preamble stating that the conventions of many States had at the time of their adopting the Constitution expressed a desire, "in order to prevent misconception or abuse of its powers, that further declaratory and restrictive clauses should be added." It is worthy of notice that in them the word "citizen" is not found. In some of them the descriptive word is "people," but in the Fifth it is broader, and the word is "person," and in the Sixth it is the "accused," while in the Third, Seventh, and Eighth there is no limitation as to the beneficiaries suggested by any descriptive word.

In the case of *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369, it was said: "The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says: 'Nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' These provisions are universal in their application to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws." The matter considered in that case was of a local nature, a municipal ordinance for regulating the carrying on of public laundries, something fairly within the police power of a State; and yet because its provisions conflicted with the guarantees of the Fourteenth Amendment, the ordinance was declared void.

If the use of the word "person" in the Fourteenth Amendment protects all individuals lawfully within the State, the use of the same word "person" in the Fifth must be equally comprehensive, and secures to all persons lawfully within the territory of the United States the protection named therein; and a like conclusion must follow as to the Sixth.

I pass, therefore, to the consideration of my third proposition: Section 6 deprives of "life, liberty, and property without due process of law." It imposes punishment without a trial, and punishment cruel and severe. It places the liberty of one individual subject to the unrestrained control of

another. Notice its provisions: It first commands all to register. He who does not register violates that law, and may be punished; and so the section goes on to say that one who has not complied with its requirements, and has no certificate of residence, "shall be deemed and adjudged to be unlawfully within the United States," and then it imposes as a penalty his deportation from the country. Deportation is punishment. It involves first an arrest, a deprival of liberty; and, second, a removal from home, from family, from business, from property. In Rapalje & Lawrence's Law Dictionary, (vol. 1, page 109,) "banishment" is thus defined: "A punishment by forced exile, either for years or for life; inflicted principally upon political offenders, 'transportation' being the word used to express a similar punishment of ordinary criminals." In 4 Bl. Com. 377, it is said: "Some punishments consist in exile or banishment, by abjuration of the realm, or transportation." In Vattel we find that "banishment is only applied to condemnation in due course of law." Note to § 228, Book 1, c. 19, in 1 Vattel.

But it needs no citation of authorities to support the proposition that deportation is punishment. Every one knows that to be forcibly taken away from home, and family, and friends, and business, and property, and sent across the ocean to a distant land, is punishment; and that oftentimes most severe and cruel. Apt and just are the words of one of the framers of this Constitution, President Madison, when he says (4 Elliot's Debates, 555): "If the banishment of an alien from a country into which he has been invited as the asylum most auspicious to his happiness — a country where he may have formed the most tender connections; where he may have invested his entire property, and acquired property of the real and permanent, as well as the movable and temporary kind; where he enjoys, under the laws, a greater share of the blessings of personal security and personal liberty than he can elsewhere hope for; . . . if, moreover, in the execution of the sentence against him he is to be exposed, not only to the ordinary dangers of the sea, but to the peculiar casualties incident to a crisis of war and of unusual licentiousness on

that element, and possibly to vindictive purposes, which his immigration itself may have provoked — if a banishment of this sort be not a punishment, and among the severest of punishments, it will be difficult to imagine a doom to which the name can be applied."

But punishment implies a trial: "No person shall be deprived of life, liberty, or property, without due process of law." Due process requires that a man be heard before he is condemned, and both heard and condemned in the due and orderly procedure of a trial as recognized by the common law from time immemorial. It was said by this court in *Hagar* v. *Reclamation District*, 111 U. S. 701, 708, "undoubtedly where life and liberty are involved, due process requires that there be a regular course of judicial proceedings, which imply that the party to be affected shall have notice and an opportunity to be heard." And by Mr. Justice Bradley, in defining "due process of law" in *Davidson* v. *New Orleans*, 96 U. S. 97, 107, "if found to be suitable or admissible in the special case, it will be adjudged to be 'due process of law,' but if found to be arbitrary, oppressive, and unjust, it may be declared to be not 'due process of law.'" And no person who has once come within the protection of the Constitution can be punished without a trial. It may be summary, as for petty offences and in cases of contempt, but still a trial, as known to the common law. It is said that a person may be extradited without a previous trial, but extradition is simply one step in the process of arresting and securing for trial. He may be removed by extradition from California to New York, or from this country to another, but such proceeding is not oppressive or unjust, but suitable and necessary, and, therefore, due process of law. But here, the Chinese are not arrested and extradited for trial, but arrested and, without a trial, punished by banishment.

Again, it is absolutely within the discretion of the collector to give or refuse a certificate to one who applies therefor. Nowhere is it provided what evidence shall be furnished to the collector, and nowhere is it made mandatory upon him to grant a certificate on the production of such evidence. It can-

not be due process of law to impose punishment on any person for failing to have that in his possession, the possession of which he can obtain only at the arbitrary and unregulated discretion of any official. It will not do to say that the presumption is that the official will act reasonably and not arbitrarily. When the right to liberty and residence is involved, some other protection than the mere discretion of any official is required. Well was it said by Mr. Justice Matthews, in the case of *Yick Wo* v. *Hopkins, supra,* on page 369 : " When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power."

Again, a person found without such certificate may be taken before a United States Judge. What judge? A judge in the district in which the party resides or is found? There is no limitation in this respect. A Chinese laborer in San Francisco may be arrested by a deputy United States marshal, and taken before a judge in Oregon; and when so taken before that judge, it is made his duty to deport such laborer unless he proves his innocence of any violation of the law, and that, too, by at least one credible white witness. And how shall he obtain that witness? No provision is made in the statute therefor. Will it be said that Article 6 of the amendments gives to the accused a right to have a compulsory process for obtaining witnesses in his favor? The reply is, that if he is entitled to one part of that article, he is entitled to all ; and among them is the right to a speedy and public trial by an impartial jury of the State and district. The only theory upon which this proceeding can be sustained is that he has no right to any benefits of this Article 6 ; and if he has no right thereto, and the statute has made no provision for securing his witnesses or limiting the proceeding to a judge of the district where he resides, the result follows inevitably, as stated, that he may be arrested by any one of the numerous officials named in the statute, and carried before any judge in

the United States that such official may select, and, then, unless he proves that which he is given no means of proving, be punished by removal from home, friends, family, property, business, to another country.

It is said that these Chinese are entitled, while they remain, to the safeguards of the Constitution and to the protection of the laws in regard to their rights of person and of property; but that they continue to be aliens, subject to the absolute power of Congress to forcibly remove them.   In other words, the guarantees of "life, liberty, and property," named in the Constitution, are theirs by sufferance and not of right.   Of what avail are such guarantees?

Once more: Supposing a Chinaman from San Francisco, having obtained a certificate, should go to New York or other place in pursuit of work, and on the way his certificate be lost or destroyed.   He is subject to arrest and detention, the cost of which is in the discretion of the court, and judgment of deportation will be suspended a reasonable time to enable him to obtain a duplicate from the officer granting it.   In other words, he cannot move about in safety without carrying with him this certificate.   The situation was well described by Senator Sherman in the debate in the Senate: "They are here ticket-of-leave men; precisely as, under the Australian law, a convict is allowed to go at large upon a ticket-of-leave, these people are to be allowed to go at large and earn their livelihood, but they must have their tickets-of-leave in their possession."   And he added: "This inaugurates in our system of government a new departure; one, I believe, never before practised, although it was suggested in conference that some such rules had been adopted in slavery times to secure the peace of society."

It is true this statute is directed only against the obnoxious Chinese; but if the power exists, who shall say it will not be exercised to-morrow against other classes and other people?   If the guarantees of these amendments can be thus ignored in order to get rid of this distasteful class, what security have others that a like disregard of its provisions may not be resorted to?   Profound and wise were the

observations of Mr. Justice Bradley, speaking for the court in *Boyd* v. *United States*, 116 U. S. 616, 635: " Illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis*."

In the *Yick Wo case*, in which was presented a municipal ordinance, fair on its face, but contrived to work oppression to a few engaged in a single occupation, this court saw no difficulty in finding a constitutional barrier to such injustice. But this greater wrong, by which a hundred thousand people are subject to arrest and forcible deportation from the country, is beyond the reach of the protecting power of the Constitution. Its grievous wrong suggests this declaration of wisdom, coming from the dawn of English history: "Verily he who dooms a worse doom to the friendless and the comer from afar than to his fellow, injures himself." (The Laws of King Cnut, 1 Thorpe's Ancient Laws and Institutes of England, p. 397.)

In view of this enactment of the highest legislative body of the foremost Christian nation, may not the thoughtful Chinese disciple of Confucius fairly ask, Why do they send missionaries here?

Mr. JUSTICE FIELD dissenting.[1]

I also wish to say a few words upon these cases and upon the extraordinary doctrines announced in support of the orders of the court below.

---

[1] Mr. Justice Field's dissenting opinion bears the titles of the three cases, Nos. 1345, 1346, and 1347, and is further generally entitled " Chinese Deportation Cases."

With the treaties between the United States and China, and the subsequent legislation adopted by Congress to prevent the immigration of Chinese laborers into this country, resulting in the Exclusion Act of October 1, 1888, the court is familiar. They have often been before us and have been considered in almost every phase. The act of 1888 declared that after its passage it should be unlawful for any Chinese laborer — who might then or thereafter be a resident of the United States, who should depart therefrom and not return before the passage of the act — to return or remain in the United States. The validity of this act was sustained by this court. 130 U. S. 581. In the opinion announcing the decision we considered the treaties with China, and also the legislation of Congress and the causes which led to its enactment. The court cited numerous instances in which statesmen and jurists of eminence had held that it was the undoubted right of every independent nation to exclude foreigners from its limits whenever in its judgment the public interests demanded such exclusion.

"The power of exclusion of foreigners," said the court, "being an incident of sovereignty belonging to the government of the United States as a part of those sovereign powers delegated by the Constitution, the right to its exercise at any time when, in the judgment of the government the interests of the country require it, cannot be granted away or restrained on behalf of any one. The powers of government are delegated in trust to the United States and are incapable of transfer to any other parties. They cannot be abandoned or surrendered. Nor can their exercise be hampered, when needed for the public good, by any considerations of private interest. The exercise of these public trusts is not the subject of barter or contract. Whatever license, therefore, Chinese laborers may have obtained previous to the act of October 1, 1888, to return to the United States after their departure, is held at the will of the government, revocable at any time at its pleasure. Whether a proper consideration by our government of its previous laws, or a proper respect for the nation whose subjects are affected by its action, ought to have qualified its inhibition and made it applicable only to

persons departing from the country after the passage of the act, are not questions for judicial determination. If there be any just ground of complaint on the part of China it must be made to the political department of our government, which is alone competent to act upon the subject." p. 609.

I had the honor to be the organ of the court in announcing this opinion and judgment. I still adhere to the views there expressed in all particulars; but between legislation for the exclusion of Chinese persons — that is, to prevent them from entering the country — and legislation for the deportation of those who have acquired a residence in the country under a treaty with China, there is a wide and essential difference. The power of the government to exclude foreigners from this country, that is, to prevent them from entering it, whenever the public interests in its judgment require such exclusion, has been repeatedly asserted by the legislative and executive departments of our government and never denied; but its power to deport from the country persons lawfully domiciled therein by its consent, and engaged in the ordinary pursuits of life, has never been asserted by the legislative or executive departments except for crime, or as an act of war in view of existing or anticipated hostilities, unless the alien act of June 25, 1798, can be considered as recognizing that doctrine. 1 Stat. 570, c. 58. That act vested in the President power to order all such aliens as he should adjudge dangerous to the peace and safety of the United States, or should have reasonable grounds to suspect were concerned in any treasonable or secret machinations against the government, to depart out of the territory of the United States within such time as should be expressed in his order. And in case any alien when thus ordered to depart should be found at large within the United States after the term limited in the order, not having obtained a license from the President to reside therein, or having obtained such license should not have conformed thereto, he should on conviction thereof be imprisoned for a term not exceeding three years, and should never afterwards be admitted to become a citizen of the United States; with a proviso that if the alien thus ordered to depart should prove to the satis-

faction of the President, by evidence to be taken before such person or persons as he should direct, that no injury or danger to the United States would arise from suffering him to reside therein, the President might grant a license to him to remain within the United States for such time as he should judge proper and at such place as he should designate. The act also provided that the President might require such alien to enter into a bond to the United States in such penal sum as he might direct, with one or more sureties to the satisfaction of the person authorized by the President to take the same, conditioned for his good behavior during his residence in the United States, and not to violate his license, which the President might revoke whenever he should think proper. The act also provided that it should be lawful for the President, whenever he deemed it necessary for the public safety, to order to be removed out of the territory of the United States any alien in prison in pursuance of the act, and to cause to be arrested and sent out of the United States such aliens as may have been ordered to depart, and had not obtained a license, in all cases where, in the opinion of the President, the public safety required a speedy removal. And that if any alien thus removed or sent out of the United States should voluntarily return, unless by permission of the President, such alien, being convicted thereof, should be imprisoned so long as in the opinion of the President the public safety might require.

The passage of this act produced great excitement throughout the country and was severely denounced by many of its ablest statesmen and jurists as unconstitutional and barbarous, and among them may be mentioned the great names of Jefferson and Madison, who are throughout our country honored and revered for their lifelong devotion to principles of constitutional liberty. It was defended by its advocates as a war measure. John Adams, the President of the United States at the time, who approved the bill and against whom the responsibility for its passage was charged, states in his correspondence that the bill was intended as a measure of that character. 9 John Adams's Works, 291. The State of Virginia denounced it in severe terms. Its general assembly

passed resolutions upon the act and another act of the same session of Congress known as the "sedition act." Upon the first — the alien act — one of the resolutions declared that it exer-cised a power nowhere delegated to the Federal government, and which, by uniting legislative and judicial powers to those of executive, subverted the general principles of free govern-ment as well as the particular organization and positive provi-sions of the Federal Constitution. 4 Elliot's Deb. 528. The resolutions upon both acts were transmitted to the legisla-tures of different States, and their communications in answer to them were referred to a committee of the general assem-bly of Virginia, of which Mr. Madison was a member; and upon them his celebrated report was made. With reference to the alien act, after observing that it was incumbent in this, as in every other exercise of power by the Federal govern-ment, to prove from the Constitution that it granted the par-ticular power exercised; and also that much confusion and fallacy had been thrown into the question to be considered by blending the two cases of aliens, *members of a hostile nation, and aliens, members of friendly nations,* he said: "With respect to alien enemies, no doubt has been intimated as to the Federal authority over them; the Constitution having expressly delegated to Congress the power to declare war against any nation, and, of course, to treat it and all its mem-bers as enemies. With respect to aliens who are not enemies, but members of nations in peace and amity with the United States, the power assumed by the act of Congress is denied to be constitutional; and it is accordingly against this act that the protest of the general assembly is expressly and exclu-sively directed." 4 Elliot's Deb. 554.

"Were it admitted, as is contended, that the 'act concern-ing aliens' has for its object, not a *penal,* but a *preventive* justice, it would still remain to be proved that it comes within the constitutional power of the Federal legislature; and; if within its power, that the legislature has exercised it in a con-stitutional manner. . . . It can never be admitted that the removal of aliens, authorized by the act, is to be con-sidered, not as punishment for an offence, but as a measure of

precaution and prevention. If the banishment of an alien from a country into which he has been invited as the asylum most auspicious to his happiness — a country where he may have formed the most tender connections; where he may have invested his entire property, and acquired property of the real and permanent as well as the movable and temporary kind; where he enjoys, under the laws, a greater share of the blessings of personal security and personal liberty, than he can elsewhere hope for; . . . if a banishment of this sort be not a punishment, and among the severest of punishments, it would be difficult to imagine a doom to which the name can be applied. And, if it be a punishment, it will remain to be inquired whether it can be constitutionally inflicted, on mere suspicion, by the single will of the executive magistrate, on persons convicted of no personal offence against the laws of the land, nor involved in any offence against the law of nations, charged on the foreign state of which they are members." 4 Elliot's Deb. 554, 555. . . .
It does not follow, because aliens are not parties to the Constitution, as citizens are parties to it, that, whilst they actually conform to it, they have no right to its protection. Aliens are not more parties to the laws than they are parties to the Constitution; yet it will not be disputed that, as they owe, on one hand, a temporary obedience, they are entitled, in return, to their protection and advantage.

If aliens had no rights under the Constitution, they might not only be banished, but even capitally punished without a jury or the other incidents to a fair trial. But, so far has a contrary principle been carried, in every part of the United States, that, except on charges of treason, an alien has, besides all the common privileges, the special one of being tried by a jury of which one-half may be also aliens.

"It is said, further, that, by the law and practice of nations, aliens may be removed, at discretion, for offences against the law of nations; that Congress is authorized to define and punish such offences; and that to be dangerous to the peace of society is, in aliens, one of those offences.

"The distinction between alien enemies and alien friends is

a clear and conclusive answer to this argument. Alien enemies are under the law of nations, and liable to be punished for offences against it. Alien friends, except in the single case of public ministers, are under the municipal law, and must be tried and punished according to that law only." 4 Elliot's Deb. 556. Massachusetts, evidently considering the alien act as a war measure, adopted in anticipation of probable hostilities, said, in answer to the resolutions of Virginia, among other things, that "the removal of aliens is the usual preliminary of hostility, and is justified by the invariable usages of nations. Actual hostility had, unhappily, been long experienced, and a formal declaration of it the government had reason daily to expect." 4 Elliot's Deb. 535.

The duration of the act was limited to two years, and it has ever since been the subject of universal condemnation. In no other instance, until the law before us was passed, has any public man had the boldness to advocate the deportation of friendly aliens in time of peace. I repeat the statement, that in no other instance has the deportation of friendly aliens been advocated as a lawful measure by any department of our government. And it will surprise most people to learn that any such dangerous and despotic power lies in our government — a power which will authorize it to expel at pleasure, in time of peace, the whole body of friendly foreigners of any country domiciled herein by its permission, a power which can be brought into exercise whenever it may suit the pleasure of Congress, and be enforced without regard to the guarantees of the Constitution intended for the protection of the rights of all persons in their liberty and property. Is it possible that Congress can, at its pleasure, in disregard of the guarantees of the Constitution, expel at any time the Irish, German, French, and English who may have taken up their residence here on the invitation of the government, while we are at peace with the countries from which they came, simply on the ground that they have not been naturalized?

Notwithstanding the activity of the public authorities in enforcing the exclusion act of 1888, it was constantly evaded.

Chinese laborers came into the country by water and by land; they came through the open ports and by rivers reaching the seas, and they came by way of the Canadas and Mexico. New means of ingress were discovered, and in spite of the vigilance of the police and customs officers great numbers clandestinely found their way into the country. Their resemblance to each other rendered it difficult, and often impossible, to prevent this evasion of the laws. It was under these circumstances that the act of May 5, 1892, c. 60, was passed. It had two objects in view. There were two classes of Chinese persons in the country, those who had evaded the laws excluding them and entered clandestinely, and those who had entered lawfully and resided therein under the treaty with China.

The act of 1892 extended, for the period of ten years from its passage, all laws then in force prohibiting and regulating the coming into the country of Chinese persons, or persons of Chinese descent; and it provided that any person, when convicted or adjudged under any of those laws of not legally being or remaining in the United States, should be removed therefrom to China, or to such other country as it might appear he was a subject of, unless such other country should demand a tax as a condition of his removal thereto, in which case he should be removed to China. The act also provided that a Chinese person arrested under its provisions, or the provisions of the acts extended, should be adjudged to be unlawfully within the United States, unless he should establish by affirmative proof his lawful right to remain within the United States; and that any Chinese person, or person of Chinese descent, "convicted and adjudged not lawfully entitled to be or remain in the United States, should be imprisoned at hard labor for a period not exceeding one year, and thereafter removed from the United States." With this class of Chinese, and with the provisions of law applicable to them, we have no concern in the present case. We have only to consider the provisions of the act applicable to the second class of Chinese persons, those who had a lawful right to remain in the United States. By the additional articles to the

treaty of 1858, adopted in 1868, generally called the Burlin-
game treaty, the governments of the two countries recognized
"the inherent and inalienable right of man to change his
home and allegiance, and also the mutual advantage of free
migration and emigration of their citizens and subjects, re-
spectively, from the one country to the other for purposes of
curiosity, of trade, or as permanent residence;" and accord-
ingly the treaty in the additional articles provided that citizens
of the United States visiting or residing in China, and Chinese
subjects visiting or residing in the United States, should recip-
rocally enjoy the same privileges, immunities, and exemptions
in respect to travel or residence as should be enjoyed by citi-
zens or subjects of the most favored nation, in the country in
which they should, respectively, be visiting or residing. 16
Stat. 739, 740. The supplemental treaty of November 17,
1880, providing for the limitation or suspension of the emigra-
tion of Chinese laborers, declared that "the limitation or
suspension shall be reasonable and apply only to Chinese who
may go to the United States as laborers, other classes not
being included in the limitation," and that "Chinese subjects,
whether residing in the United States as teachers, students,
merchants, or from curiosity, together with their body and
household servants, and Chinese laborers who were then in
the United States, shall be allowed to go and come of their
own free will and accord, and shall be accorded all rights,
privileges, immunities, and exemptions, which are accorded to
the citizens and subjects of the most favored nation."

There are many thousands of Chinese laborers who came to
the country and resided in it under the additional articles of
the treaty adopted in 1868, and were in the country at the
time of the adoption of the supplemental treaty of November,
1880. To these laborers thus lawfully within the limits of
the United States section six of the act of May 5, 1892, relates.
That section, so far as applicable to the present cases, is as
follows:

"Sec. 6. And it shall be the duty of all Chinese laborers
within the limits of the United States at the time of the
passage of this act and *who are entitled to remain in the*

*United States*, to apply to the collector of internal revenue of their respective districts, within one year after the passage of this act, for a certificate of residence, and any Chinese laborer within the United States, who shall neglect, fail or refuse to comply with the provisions of this act, or who, after one year from the passage hereof, shall be found within the jurisdiction of the United States without such certificate of residence, shall be deemed and adjudged to be unlawfully within the United States, and may be arrested by any United States customs official, collector of internal revenue or his deputies, United States marshal or his deputies, and taken before a United States judge, whose duty it shall be to order that he be deported from the United States, as hereinbefore provided, unless he shall establish clearly to the satisfaction of the said judge that by reason of accident, sickness or other unavoidable cause, he has been unable to procure his certificate, and to the satisfaction of the court, and by at least one credible white witness, that he was a resident of the United States at the time of the passage of this act; and if upon the hearing it shall appear that he is so entitled to a certificate, it shall be granted upon his paying the cost. Should it appear that said Chinaman had procured a certificate which has been lost or destroyed, he shall be detained and judgment suspended a reasonable time to enable him to procure a duplicate from the officer granting it, and in such cases the cost of said arrest and trial shall be in the discretion of the court."

The purpose of this section was to secure the means of readily identifying the Chinese laborers present in the country and entitled to remain, from those who may have clandestinely entered the country in violation of its laws. Those entitled to remain, by having a certificate of their identification, would enable the officers of the government to readily discover and bring to punishment those not entitled to enter but who are excluded. To procure such a certificate was not a hardship to the laborers, but a means to secure full protection to them, and at the same time prevent an evasion of the law.

This object being constitutional, the only question for our

consideration is the lawfulness of the procedure provided for its accomplishment, and this must be tested by the provisions of the Constitution and laws intended for the protection of all persons against encroachment upon their rights. Aliens from countries at peace with us, domiciled within our country by its consent, are entitled to all the guaranties for the protection of their persons and property which are secured to native-born citizens. The moment any human being from a country at peace with us comes within the jurisdiction of the United States, with their consent — and such consent will always be implied when not expressly withheld, and in the case of the Chinese laborers before us was in terms given by the treaty referred to — he becomes subject to all their laws, is amenable to their punishment and entitled to their protection. Arbitrary and despotic power can no more be exercised over them with reference to their persons and property, than over the persons and property of native-born citizens. They differ only from citizens in that they cannot vote or hold any public office. As men having our common humanity, they are protected by all the guaranties of the Constitution. To hold that they are subject to any different law or are less protected in any particular than other persons, is in my judgment to ignore the teachings of our history, the practice of our government, and the language of our Constitution. Let us test this doctrine by an illustration. If a foreigner who resides in the country by its consent commits a public offence, is he subject to be cut down, maltreated, imprisoned, or put to death by violence, without accusation made, trial had, and judgment of an established tribunal following the regular forms of judicial procedure? If any rule in the administration of justice is to be omitted or discarded in his case, what rule is it to be? If one rule may lawfully be laid aside in his case, another rule may also be laid aside, and all rules may be discarded. In such instances a rule of evidence may be set aside in one case, a rule of pleading in another; the testimony of eye-witnesses may be rejected and hearsay adopted, or no evidence at all may be received, but simply an inspection of the accused, as is often

the case in tribunals of Asiatic countries where personal caprice and not settled rules prevail. That would be to establish a pure, simple, undisguised despotism and tyranny with respect to foreigners resident in the country by its consent, and such an exercise of power is not permissible under our Constitution. Arbitrary and tyrannical power has no place in our system. As said by this court, speaking by Mr. Justice Matthews, in *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369: "When we consider the nature and theory of our institutions of government, the principles upon which they are supposed to rest, and view the history of their development, we are constrained to conclude they do not mean to leave room for the play and action of purely personal and arbitrary power. . . . The fundamental rights to life, liberty, and the pursuit of happiness as individual possessions are secured by those maxims of constitutional law which are the monuments, showing the victorious progress of the race in securing to man the blessings of civilization under the reign of just and equal laws." What once I had occasion to say of the protection afforded by our government I repeat: "It is certainly something in which a citizen of the United States may feel a generous pride that the government of his country extends protection to all persons within its jurisdiction; and that every blow aimed at any of them, however humble, come from what quarter it may, is 'caught upon the broad shield of our blessed Constitution and our equal laws.'" *Ho Ah Kow* v. *Nunan,* 5 Sawyer, 552, 563.

I utterly dissent from and reject the doctrine expressed in the opinion of the majority, that "Congress, under the power to exclude or expel aliens, might have directed any Chinese laborer found in the United States without a certificate of residence to be removed out of the country by executive officers, without judicial trial or examination, just as it might have authorized such officers absolutely to prevent his entrance into the country." An arrest in that way for that purpose would not be a reasonable seizure of the person within the meaning of the Fourth Article of the amendments to the Constitution. It would be brutal and oppressive. The

existence of the power thus stated is only consistent with the admission that the government is one of unlimited and despotic power so far as aliens domiciled in the country are concerned. According to its theory, Congress might have ordered executive officers to take the Chinese laborers to the ocean and put them into a boat and set them adrift; or to take them to the borders of Mexico and turn them loose there; and in both cases without any means of support; indeed, it might have sanctioned towards these laborers the most shocking brutality conceivable. I utterly repudiate all such notions, and reply that brutality, inhumanity, and cruelty cannot be made elements in any procedure for the enforcement of the laws of the United States.

The majority of the court have, in their opinion, made numerous citations from the courts and the utterances of individuals upon the power of the government of an independent nation to exclude foreigners from entering its limits, but none, beyond a few loose observations, as to its power to expel and deport from the country those who are domiciled therein by its consent. The citation from the opinion in the recent case of *Nishimura Ekiu* v. *United States*, (the Japanese case,) 142 U. S. 651.; the citation from the opinion in *Chae Chan Ping* v. *United States*, (the Chinese Exclusion case,) 130 U. S. 581, 604, 606; the citation in the case before the judiciary committee of the Privy Council — all have reference to the exclusion of foreigners from entering the country. They do not touch upon the question of deporting them from the country after they have been domiciled within it by the consent of its government, which is the real question in the case. The citation from Vattel is only as to the power of exclusion, that is, from coming to the country. The citation from Phillimore is to the same effect. As there stated, the government allowing the introduction of aliens may prescribe the conditions on which they shall be allowed to remain, the conditions being imposed whenever they enter the country. There is no dispute about the power of Congress to prevent the landing of aliens in the country; the question is as to the power of Congress to deport them with-

out regard to the guaranties of the Constitution. . The statement that in England the power to expel aliens has always been recognized and often exercised, and the only question that has ever been as to this power is whether it could be exercised by the King without the consent of Parliament, is, I think, not strictly accurate. The citations given by Mr. Choate in his brief show conclusively, it seems to me, that deportation from the realm has not been exercised in England since Magna Charta, except in punishment for crime, or as a measure in view of existing or anticipated hostilities. But even if that power were exercised by every government of Europe, it would have no bearing in these cases. It may be admitted that the power has been exercised by the various governments of Europe. Spain expelled the Moors; England, in the reign of Edward I, banished fifteen thousand Jews;[1] and Louis XIV, in 1685, by revoking the Edict of Nantes, which gave religious liberty to Protestants in France, drove out the Huguenots. Nor does such severity of European governments belong only to the distant past. Within three years Russia has banished many thousands of Jews, and apparently intends the expulsion of the whole race — an act of barbarity which has aroused the indignation of all Christendom. Such was the feeling in this country that, friendly as our relations with Russia had always been, President Harrison felt compelled to call the attention of Congress to it in his message in 1891 as a fit subject for national remonstrance. Indeed, all the instances mentioned have been condemned for their barbarity and cruelty, and no power to perpetrate such barbarity is to be implied from the nature of our government, and certainly is not found in any delegated powers under the Constitution.

The government of the United States is one of limited and delegated powers. It takes nothing from the usages or the former action of European governments, nor does it take any power by any supposed inherent sovereignty. There is a great deal of confusion in the use of the word " sovereignty "

---

[1] The Jews during his reign were cruelly despoiled, and in 1290 ordered, under penalty of death, to quit England forever before a certain day. — American Encyclopædia, vol. 6, p. 434.

by law writers. Sovereignty or supreme power is in this country vested in the people, and only in the people. By them certain sovereign powers have been delegated to the government of the United States and other sovereign powers reserved to the States or to themselves. This is not a matter of inference and argument, but is the express declaration of the Tenth Amendment to the Constitution, passed to avoid any misinterpretation of the powers of the general government. That amendment declares that "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to the people." When, therefore, power is exercised by Congress, authority for it must be found in express terms in the Constitution, or in the means necessary or proper for the execution of the power expressed. If it cannot be thus found, it does not exist.

It will be seen by its provisions that the sixth section recognizes the right of certain Chinese laborers to remain in the United States, but to render null that right it declares that if within one year after the passage of the act any Chinese laborer shall have neglected, failed, or refused to comply with the provisions of the act to obtain a certificate of residence, or shall be found within the jurisdiction of the United States without a certificate of residence, he shall be deemed and adjudged to be unlawfully within the United States, and may be arrested by any United States customs official, collector of internal revenue or his deputies, a United States marshal or his deputies, and taken before a United States judge, whose duty it shall be to order that he be deported from the United States, unless he shall establish clearly to the satisfaction of the judge that by reason of accident, sickness, or other unavoidable cause he has been unable to secure his certificate, and to the satisfaction of the judge by at least one credible white witness that he was a resident of the United States at the time of the passage of the act. His deportation is thus imposed for neglect to obtain a certificate of residence, from which he can only escape by showing his inability to secure it from one of the causes named. That is the punishment

for his neglect, and that being of an infamous character can only be imposed after indictment, trial, and conviction. If applied to a citizen, none of the justices of this court would hesitate a moment to pronounce it illegal. Had the punishment been a fine, or anything else than of an infamous character, it might have been imposed without indictment; but not so now, unless we hold that a foreigner from a country at peace with us, though domiciled by the consent of our government, is withdrawn from all the guaranties of due process of law prescribed by the Constitution, when charged with an offence to which the grave punishment designated is affixed.

The punishment is beyond all reason in its severity. It is out of all proportion to the alleged offence. It is cruel and unusual. As to its cruelty, nothing can exceed a forcible deportation from a country of one's residence, and the breaking up of all the relations of friendship, family, and business there contracted. The laborer may be seized at a distance from his home, his family and his business, and taken before the judge for his condemnation, without permission to visit his home, see his family, or complete any unfinished business. Mr. Madison well pictures its character in his powerful denunciation of the alien law of 1798 in his celebrated report upon the resolutions, from which we have cited, and concludes, as we have seen, that *if a banishment of the sort described be not a punishment, and among the severest of punishments, it will be difficult to imagine a doom to which the name can be applied.*

Again, when taken before a United States judge, he is required, in order to avoid the doom declared, to establish clearly to the satisfaction of the judge that by reason of accident, sickness, or other unavoidable cause, he was unable to secure his certificate, and that he was a resident of the United States at the time, *by at least one credible white witness.* Here the government undertakes to exact of the party arrested the testimony of a witness of a particular color, though conclusive and incontestible testimony from others may be adduced. The law might as well have said, that unless the laborer

should also present a particular person as a witness who could not be produced, from sickness, absence, or other cause, such as the archbishop of the State, to establish the fact of residence, he should be held to be unlawfully within the United States.

There are numerous other objections to the provisions of the act under consideration. Every step in the procedure provided, as truly said by counsel, tramples upon some constitutional right. Grossly it violates the Fourth Amendment, which declares that: "The right of the people to be secure in their persons, . . . against unreasonable searches and seizures, shall not be violated, and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the . . . persons . . . to be seized."

The act provides for the seizure of the person without oath or affirmation or warrant, and without showing any probable cause by the officials mentioned. The arrest, as observed by counsel, involves a search of his person for the certificate which he is required to have always with him. Who will have the hardihood and effrontery to say this is not an "unreasonable search and seizure of the person"? Until now it has never been asserted by any court or judge of high authority that foreigners domiciled in this country by the consent of our government could be deprived of the securities of this amendment; that their persons could be subjected to unreasonable searches and seizures, and that they could be arrested without warrant upon probable cause supported by oath or affirmation.

I will not pursue the subject further. The decision of the court and the sanction it would give to legislation depriving resident aliens of the guaranties of the Constitution fills me with apprehensions. Those guaranties are of priceless value to every one resident in the country, whether citizen or alien. I cannot but regard the decision as a blow against constitutional liberty, when it declares that Congress has the right to disregard the guaranties of the Constitution intended for the protection of all r en, domiciled in the country with the consent of the govern ient, in their rights of person and property.

How far will its legislation go? The unnaturalized resident feels it to-day, but if Congress can disregard the guaranties with respect to any one domiciled in this country with its consent, it may disregard the guaranties with respect to naturalized citizens. What assurance have we that it may not declare that naturalized citizens of a particular country cannot remain in the United States after a certain day, unless they have in their possession a certificate that they are of good moral character and attached to the principles of our Constitution, which certificate they must obtain from a collector of internal revenue upon the testimony of at least one competent witness of a class or nationality to be designated by the government?

What answer could the naturalized citizen in that case make to his arrest for deportation, which cannot be urged in behalf of the Chinese laborers of to-day?

I am of the opinion that the orders of the court below should be reversed, and the petitioners should be discharged.

Mr. Chief Justice Fuller dissenting.

I also dissent from the opinion and judgment of the court in these cases.

If the protection of the Constitution extends to Chinese laborers who are lawfully within and entitled to remain in the United States under previous treaties and laws, then the question whether this act of Congress so far as it relates to them is in conflict with that instrument, is a judicial question, and its determination belongs to the judicial department.

However reluctant courts may be to pass upon the constitutionality of legislative acts, it is of the very essence of judicial duty to do so when the discharge of that duty is properly invoked.

I entertain no doubt that the provisions of the Fifth and Fourteenth Amendments, which forbid that any person shall be deprived of life, liberty, or property without due process of law, are in the language of Mr. Justice Matthews, already quoted by my brother Brewer, "universal in their application to all persons within the territorial jurisdiction, without

regard to any differences of race, of color, or of nationality," and although in *Yick Wo's case* only the validity of a municipal ordinance was involved, the rule laid down as much applies to Congress under the Fifth Amendment as to the States under the Fourteenth. The right to remain in the United States, in the enjoyment of all the rights, privileges, immunities, and exemptions accorded to the citizens and subjects of the most favored nation, is a valuable right, and certainly a right which cannot be taken away without taking away the liberty of its possessor. This cannot be done by mere legislation.

The argument is that friendly aliens, who have lawfully acquired a domicil in this country, are entitled to avail themselves of the safeguards of the Constitution only while permitted to remain, and that the power to expel them and the manner of its exercise are unaffected by that instrument. It is difficult to see how this can be so in view of the operation of the power upon the existing rights of individuals; and to say that the residence of the alien, when invited and secured by treaties and laws, is held in subordination to the exertion against him, as an alien, of the absolute and unqualified power asserted, is to import a condition not recognized by the fundamental law. Conceding that the exercise of the power to exclude is committed to the political department, and that the denial of entrance is not necessarily the subject of judicial cognizance, the exercise of the power to expel, the manner in which the right to remain may be terminated, rest on different ground, since limitations exist or are imposed upon the deprivation of that which has been lawfully acquired. And while the general government is invested, in respect of foreign countries and their subjects or citizens, with the powers necessary to the maintenance of its absolute independence and security throughout its entire territory, it cannot, in virtue of any delegated power, or power implied therefrom, or of a supposed inherent sovereignty, arbitrarily deal with persons lawfully within the peace of its dominion. But the act before us is not an act to abrogate or repeal treaties or laws in respect of Chinese laborers entitled to remain in the United States, or

to expel them from the country, and no such intent can be imputed to Congress.   As to them, registration for the purpose of identification is required, and the deportation denounced for failure to do so is by way of punishment to coerce compliance with that requisition.   No euphuism can disguise the character of the act in this regard.   It directs the performance of a judicial function in a particular way, and inflicts punishment without a judicial trial.   It is, in effect, a legislative sentence of banishment, and, as such, absolutely void.   Moreover, it contains within it the germs of the assertion of an unlimited and arbitrary power, in general, incompatible with the immutable principles of justice, inconsistent with the nature of our government, and in conflict with the written Constitution by which that government was created and those principles secured.