**UNITED STATES ex rel. MEZEI v. SHAUGHNESSY, District Director, Immigration and Naturalization.**

No. 189, Docket 22263.

United States Court of Appeals Second Circuit.

Argued Feb. 8, 1952.

Decided March 20, 1952.

---

2. The quoted section has been repealed, but it applied to all persons dying prior to December 31, 1947.

L. Hand, J., dissented.

Jack Wasserman, Washington, D. C. (George Moerman, New York City, on the brief), for relator.

William J. Sexton, Asst. U. S. Atty., New York City (Myles J. Lane, U. S. Atty., New York City, Louis Steinberg, Dist. Counsel, and Max Blau and Lester Friedman, Attys., U. S. Department of Justice, Immigration and Naturalization Service, all of New York City, on the brief), for respondent.

Before SWAN, Chief Judge, and L. HAND and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The District Director of the Immigration and Naturalization Service for the New York District appeals from a final order of the District Court sustaining a writ of habeas corpus and directing the conditional release of the relator after twenty-one months' custody on Ellis Island. The order was entered after respondent had declined to produce certain information called for by the judge in a preliminary decision, D.C.S.D.N.Y., 101 F.Supp. 66. From the facts it appears that Mezei, the relator, was born on Gibraltar in 1897 and thus is a native of Great Britain. He was admitted to the United States on December 23, 1923, for permanent residence and has lived for the past twenty-five odd years in Buffalo, New York, where he owns his own house. He is married to a native-born American and his children were also born in this country. It is pointed out in his behalf that during World War II he sold United States War Bonds, donated blood to the Red Cross, and acted as a civilian defense air-raid warden.

But in 1948 Mezei left the United States, apparently to see his dying mother in Europe, and, though refused permission to enter Roumania where she resided, remained for some months in Hungary because of "difficulty in securing an exit permit." Finally, on February 2, 1950, he sailed from Le Havre on the Ile de France for return to the United States, armed with an American quota visa issued by our Budapest Consulate December 1, 1949. On his arrival in New York, February 9, however, he was temporarily excluded by the immigration authorities from admission pursuant to 8 CFR 175.57. On May 10, the Attorney General ordered the exclusion made permanent and denied relator's request for a hearing before a Board of Special Inquiry pursuant to the same regulation authorizing a denial of such a hearing when the disclosure of confidential information would be "prejudicial to the public interest."

Thereafter two attempts were made to deport him to France, "the country whence [he] came." 8 U.S.C.A. § 154. Both times upon relator's arrival on their shores the French authorities denied him admission. Since then he has made continued efforts to effect entry elsewhere, applying to some twelve other nations. The State Depart-

ment has negotiated unsuccessfully for his return to Hungary. None will have him. As the matter comes to us, then, relator is stateless and, until he succeeds in gaining admission to some foreign country, all of which have thus far been unanimous in their inhospitality, he will remain in confinement on Ellis Island. Hence this writ.

Why his presence here is "prejudicial to the interests of the United States" is an undisclosed secret known only to the Attorney General's staff. For his part, relator has alleged the only basis for such a determination of which he is aware to be a previous membership in the International Workers' Order, which he joined for the purpose of securing life insurance. We note in passing that the Supreme Court has voided the inclusion of this organization on the Attorney General's list of subversive organizations without a hearing. Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817. Respondent, in the court below, refused to disclose the actual reasons when the District Judge directed that the writ be sustained unless he indicate them *in camera*. D.C.S.D.N.Y., 101 F.Supp. 66, 70. The final order was entered in the context of this refusal. Thus this appeal brings before us the question of whether or not indefinite detention on Ellis Island is to be permitted on the basis of the Attorney General's unreviewable permanent order of exclusion. We do not think it is.

■ It is true, as a divided Supreme Court has recently reiterated, that "an alien who seeks admission to this country may not do so under any claim of right." United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317. Nor need the determination of who is to be turned back be made on the basis of a hearing or the disclosure of the reasons why admission is to be denied. Ibid. To this end, then, a confinement without hearing is justified as in the exercise of the sovereign prerogative to exclude any and all aliens who seek entry into the United States.

But the power to hold can never be broader than the power to remove or shut out. To continue an alien's confinement beyond that moment when deportation becomes patently impossible is to deprive him of his liberty. See Walker v. Chief Quarantine Officer, D.C.Canal Zone, 69 F.Supp. 980. And unless accompanied by those indicia of legal procedure that are embedded in the constitution as the right of all men—including an objective standard of prohibited action, the right to counsel and to confront accusers, and a speedy trial—such confinement must violate the Fifth Amendment.

■ Respondent, relying heavily on the majority Knauff opinion, contends that constitutional protection is never available to an excluded alien. The irrelevance of the Fifth Amendment to the procedure there challenged, however, was based not on the fact that Mrs. Knauff was an alien denied admission, but rather on the theory that an order of deportation is not punishment for a crime and so one denied entry is not deprived of either life, liberty, or property. This is a distinction long recognized in the cases. See, e. g., Fong Yue Ting v. United States, 149 U.S. 698, 723–724, 730, 13 S.Ct. 1016, 37 L.Ed. 905. But where, as here, confinement is no longer justifiable as a means to effectuate removal elsewhere, then liberty as such is at stake and the mandate of due process of law may be invoked by all, "whether citizens, aliens, alien enemies or enemy belligerents." Rutledge, J., dissenting in Re Yamashita, 327 U.S. 1, 41, 42, 66 S.Ct. 340, 360, 90 L.Ed. 499. The Fifth Amendment provides without qualification that no person shall "be deprived of life, liberty, or property, without due process of law." It is not confined to the protection of citizens; and its provisions, by definition, "are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality." Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 50 L.Ed. 220. They extend in fact to all whose presence here brings them within reach of the judicial and administrative processes of the United States Government. United States v. Pink, 315 U.S. 203, 228, 62 S.Ct. 552, 86 L.Ed. 796.

■■ Thus the courts have held in the past that even a pending deportation does not make unavailable to aliens the privilege against self-incrimination, Schoeps v. Carmichael, 9 Cir., 177 F.2d 391, 400, certiorari denied 339 U.S. 914, 70 S.Ct. 566, 94 L.Ed. 1340; the right to reasonable bail, United States ex rel. Pirinsky v. Shaughnessy, 2 Cir., 177 F.2d 708; or the protection against cruel and unusual punishments, Wong Wing v. United States, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140. Nor while residing here are they prohibited from appealing to the guaranties of freedom of speech, Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103, or against unreasonable searches and seizures, United States v. Wong Quong Wong, D.C.Vt., 94 F. 832. We think it must follow that detention of a person in possession of a valid visa enabling him to reach our shores is justified only as a means necessary to carry out his lawful removal from the country. Wong Wing v. United States, supra, 163 U.S. at page 235, 16 S.Ct. at page 980. Hence where it no longer subserves this end and becomes instead nothing less than a device for imprisonment for past or suspected misdeeds without due process of law, it must violate the mandates of the Fifth Amendment. See Ex parte Eguchi, D.C.S.D.Cal., 58 F.2d 417.

■■ Nor has Congress spoken to the contrary. The assumed executive power to confine non-resident aliens seeking entry is not specifically granted; rather it is inferred from 8 U.S.C.A. § 137—4, providing for "temporary exclusion" of any alien who appears to the examining immigration authority to be subversive under 8 U.S.C.A. § 137. We are unable from this to infer a congressional conception of incarceration any broader than the exclusion process it was designed to effectuate. This would seem re-emphasized by the provisions of 8 U.S.C.A. § 156(a, b) made specifically applicable to deportation proceedings. By these it is provided that where the Attorney General is unable to effect the removal elsewhere of undesirable aliens within the continental United States, he cannot keep them confined beyond a period of six months, but must enlarge them, though under provisions for their supervision if he finds that necessary. Detention in warrant deportation cases is thus specifically limited in time. We think this indicates a legislative policy in line with constitutional mandates. That no explicit provision is applicable in exclusion proceedings against aliens not already admitted does not, we think, signify another policy as to such persons. Rather it reflects the normal situation that an alien excluded from our shores is not here to be indefinitely confined; it is simply not geared to the case, developed by necessity and legal theory, where an alien is constructively not here, although actually with us in physical presence for an indefinite stay. So judicial power to release an alien from a general "unreasonable detention" has been widely accepted by the district courts. See United States ex rel. Chu Leung v. Shaughnessy, D.C.S.D.N.Y., 88 F.Supp. 91, affirmed 2 Cir., 176 F.2d 249; In re Krajcirovic, D.C. Mass., 87 F.Supp. 379; Staniszewski v. Watkins, D.C.S.D.N.Y., 80 F.Supp. 132; United States ex rel. Janavaris v. Nicolls, D.C.Mass., 47 F.Supp. 201.

This power, however, has never before been exercised in favor of a "security" risk, and respondent urges this element on us as a ground for distinction. If the distinction exists it is not to be found in the statute. Congress has spoken here only to give the Attorney General the general power to make an exclusion order permanent; no broader sanctions against subversive aliens are provided for than for those who are excluded because of mental disability or disease. United States ex rel. Schwarzkopf v. Uhl, 2 Cir., 137 F.2d 898, 900, therefore, recognizing the validity of more extensive statutory detention of allegedly dangerous foreigners in time of war without trial, is on this ground inapposite.

But respondent carries his vigorous objection further, asserting on grounds of public safety that this precedent will require the release of a host of persons dedicated to conspiring against the United States or actively participating with foreign governments or their nationals in continuing designs against us. Since counsel, as representing not only the respondent,

but also the Attorney General, have declined to give the court, even *in camera*, specific grounds for their violent fears as to this individual, we can only draw conclusions from such general factors as are obvious to all. Thus we know that the federal investigative agencies continue in operation; the criminal statutes forbidding espionage, sabotage, and broader types of dangerous activity remain in force; and the speedy indictment and trial of actual crime in the courts still obtain. So, relying on our normal powers of observation, we cannot share the well-nigh fantastic belief that this individual, identified, isolated, and under the strict surveillance to which he is and will now be subjected, constitutes so vital a menace to the peace and safety of this powerful nation that henceforth he must be held in strict confinement. On the other hand, there is no doubt of the meaning of the course we are asked to validate. However much it be clothed in legal semantics it is that a settled twenty-five-year resident of this country be now held in indefinite imprisonment without trial and on the uncontrolled direction of the policing arm of the executive. Even in a criminal case and after conviction had, Mr. Justice Jackson has said in words of eloquent admonishment: "Imprisonment to protect society from predicted but unconsummated offenses is so unprecedented in this country and so fraught with danger of excesses and injustice that I am loath to resort to it, even as a discretionary judicial technique to supplement conviction of such offenses as those of which defendants stand convicted." Williamson v. United States, 2 Cir., 184 F.2d 280, 282. But the plight of this relator is actually much worse than if the charge against him had been formulated as one for indictment and criminal prosecution; for then he would have had the ordinary safeguards of judge and jury and face at least a definite punishment.

It must be noted, too, that in the absence of any indication of overt acts of subversiveness upon the part of the relator, we come dangerously close to imprisonment for mere beliefs or propaganda. If in fact our country needs so drastic a restraint as this, violative of all our concepts of due process,

against this individual thus situated, then it would indeed seem admitted, as a former distinguished Attorney General has pointed out, that "our institutions do not have the sturdiness which our words to the rest of the world announce, and will falter under the greater impact of the alien dogma." Biddle, The Fear of Freedom 10, 1951. "Nothing that the agents of communism have done or can do in this country is so dangerous to the United States as what they have induced us * * * to do to ourselves." Barth, The Loyalty of Free Men, 1951, quoted by Professor Z. Chafee, Foreword, x.

The most recent decision of the Supreme Court, Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525, which upholds the Attorney General's discretionary power to deny bail pending determination of deportability, as we read it, does not controvert our view, but, we believe, lends a measure of support to it. The Court's interpretation of § 23 of the Internal Security Act of 1950, 8 U.S. C.A. § 156(a), is expressly traced to the opinions of this court in United States ex rel. Zapp v. District Director of Immigration & Naturalization, 2 Cir., 120 F.2d 762; United States ex rel. Potash v. District Director of Immigration & Naturalization, 2 Cir., 169 F.2d 747; United States ex rel. Doyle v. District Director of Immigration & Naturalization, 2 Cir., 169 F.2d 753; and United States ex rel. Pirinsky v. Shaughnessy, supra, and supports the approach of this court in our prevailing and dissenting opinions in United States ex rel. Young v. Shaughnessy, 2 Cir., 194 F.2d 474. Certainly, of itself, it does not broaden the right of restraint beyond all need of what it is designed to effectuate, but specifies that "Detention is necessarily a part of this deportation procedure." 342 U.S. 538, 72 S.Ct. 533. The opinion is in fact quite carefully limited to the case in hand, perhaps because of the vigorous dissents on the part of four of the justices. So it states "that the problem of habeas corpus after unusual delay in deportation hearings is not involved in this case." 342 U.S. 546, 72 S.Ct. 537. *A fortiori*, it would seem, this postpones for the future final adjudication of the effect of unusual delay in carrying out

of the administrative writ after the proceedings as to deportability have reached their conclusion.

■ The relator has also appealed from the District Court's enlargement order. He contends that the condition of a $5,000 performance bond and the limitation on his travel to the Southern District of New York are in conflict with an alleged right to complete release and further are unreasonable. As to the first, there can be no doubt that bond and movement limitations may be set under the general authority to impose conditions "upon the performance of which the continued liberty of the alien to reside within the bounds of this country may be made to depend." Zakonaite v. Wolf, 226 U.S. 272, 275, 33 S.Ct. 31, 32, 57 L.Ed. 218; Ex parte Lee Fong Fook, D.C.N.D.Cal., 74 F.Supp. 68, reversed on other grounds Lee Fong Fook v. Wixon, 9 Cir., 170 F.2d 245, certiorari denied 336 U.S. 914, 69 S.Ct. 604, 93 L.Ed. 1077; Anthony v. Hunter, D.C.Kan., 71 F.Supp. 823; and United States ex rel. Chong Mon v. Day, D.C.S.D.N.Y., 36 F.2d 278, are instances where the courts have set conditions of this nature on the issuance of a writ of habeas corpus.

■ But serious doubt may be entertained as to the reasonableness of all of the conditions here set. Their function is essentially to secure the reappearance of relator, should deportation subsequently become possible. See Stack v. Boyle, 342 U.S. 1, 4–5, 72 S.Ct. 1. Thus the $5,000 bond may be, as alleged, unduly high; petitioner asserts his inability to satisfy it and there is no evidence that he is presently at large. Such a bond should not be of such an amount as substantially to defeat the relator's right to enlargement. And the restriction of his movements to the Southern District of New York seems especially severe in view of the fact that his wife, family, and home are located in Buffalo. Relator's final objection to the absence of a hearing prior to the order of deportation, however, is without substance in view of the holding in United States ex rel. Knauff v. Shaughnessy, supra.

We therefore affirm on respondent's appeal and reverse and remand on relator's appeal for a hearing before the District Judge on the sole question of the reasonableness of these conditions set on relator's enlargement.

L. HAND, Circuit Judge (dissenting).

I believe that my brothers agree that Mezei, although he had been long lawfully resident in the United States, was not entitled, when he left in 1948, to reenter as an alien who had "temporarily departed"[1]; and that he was in precisely the same position as though this had been his first visit. United States ex rel. Polymeris v. Trudell, 284 U.S. 279, 52 S.Ct. 143, 76 L.Ed. 291. I assume that we also agree that his presence at Ellis Island did not change his legal situation from what it had been when the inspector excluded him on the ship; he had not "entered" the United States and the order before us is one of "exclusion" and not of "deportation." Kaplan v. Tod, 267 U.S. 228, 45 S.Ct. 257, 69 L.Ed. 585 (incidentally that was a far harsher case than this). So much taken for granted, the only question is whether an alien, who comes to this country and is lawfully excluded, may secure a qualified admission because there is no country which will accept him, for I shall take it that that is true of Mezei.

I do not believe that an alien so situated can force us to admit him at all. Suppose, as I have just suggested, that the respondent had refused to let him leave the ship. I do not see what legal process Mezei could have invoked to get ashore before she left; nor do I see what theory supports the claim that, because we did not impose upon him this harsher alternative, but ex gratia, allowed him to land until his case was decided, we must grant him even a limited version of that entry which the statute denies him. For we must remember that the order does give him a privilege of entry which will endure as long as no other country will receive him. Moreover, although that privilege is hedged about in various ways, he will be able nevertheless to mingle with the mass of

1. § 213(b), Title 8 U.S.C.A.

citizens, and spread among them what I suppose we are to consider as the contagion of his baleful presence. Think what one may of a statute based upon such fears, when passed by a society which professes to put its faith in the free interchange of ideas, a court has no warrant for refusing to enforce it. If that society chooses to flinch when its principles are put to the test, courts are not set up to give it derring-do.

No constitutional question can arise. An alien, who comes to our shores and the ship which bears him, take the chance that he may not be allowed to land. If that chance turns against them, both know, or, if they do not, they are charged with knowledge, that, since the alien cannot land, he must find an asylum elsewhere; or, like the Flying Dutchman, forever sail the seas. When at his urgence we do let him go ashore— *pendente lite* so to say—we may give him whatever harborage we choose, until he finds shelter elsewhere if he can. Had Mezei never resided here, I wonder whether this would have been doubted, and, as I have said, we are forced to treat him as though he never had been a resident.