## UNITED STATES ex rel. CAMEZON [CAMAZON] v. DISTRICT DIRECTOR OF IMMIGRATION & NATURALIZATION AT PORT OF NEW YORK.

United States District Court
S. D. New York.
April 22, 1952.

Myles J. Lane, U. S. Atty., New York City (Wm. J. Sexton, Asst. U. S. Atty., New York City, of counsel), for petitioner.

Blanch Freedman, New York City, for respondent.

SUGARMAN, District Judge.

On March 4, 1952, while relator Camazon was one of a party, destined for Idlewild Airport for transportation out of this country, a writ of habeas corpus was sued out on the petition of his attorney, whereupon Camazon was removed from the party and brought to Ellis Island to await disposition of the writ. The writ was argued, at which time the respondent made return thereto and relator was permitted to file a traverse to the return.

Appended to the respondent's return was the record of a hearing accorded relator by a Board of Special Inquiry of the Immigration and Naturalization Service at Baltimore, Maryland, on March 8, 1951. That record disclosed the following facts, reassembled in chronological order.

The relator, Felipe Camazon, was born at Brandio, Bilbao, Province of Biscay, Spain, on June 17, 1911. He resided continuously in Spain until about 1935.

From 1929 until 1931 he belonged to the Spanish Communist Party. He joined the Party at Bilbao when he was eighteen years old and remained a member for about two years when he quit. During his two years' membership, he was active, but not an officer. His activity consisted of distributing Communist pamphlets and circulars and trying to persuade workers to strike and to join the Party. He understood the contents of the material which he distributed and knew that it advocated the overthrow of the Government of Spain and the establishment there of a Communist form of government. He quit the Party because his fellow-Communists, although they talked a lot, at the time of action hid themselves, and also because his family was Catholic and he saw nothing in the Party that he liked.

From 1932 to 1933 the relator served in the Spanish Army. In 1935 he left Spain for the first time and went to Bayonne, France. Later he returned to Spain and served in the Spanish Loyalist Forces during the Revolution. While thus serving in the Loyalist Forces, relator was not a member of the Communist Party and fought only for the Republic. He fought for about a year, was taken prisoner by the Italians, held by them for two months and then turned over to Franco's Army as a prisoner. In 1943 he was released and instructed to report weekly to the District Police. Shortly thereafter he again crossed the border into France and continued to live there on and off, claiming his last residence in France to have been at Rouen (papers, on his person at the

hearing, indicating that in October of 1949 he had been permitted residence in Rouen, France, temporarily for one month to seek a ship). Apparently, during his sojourn in France, he went to sea, on and off.

On August 18, 1947 Camazon arrived in the United States for the first time, as a stowaway on the Panamanian vessel "Global Shipper". The next day he was excluded from the United States by a Board of Special Inquiry as a stowaway not in possession of an unexpired immigration visa, valid passport or official document and forbidden to return to the United States for a year. A few days later he left these shores for France on the same ship on which he had arrived.

In April of 1950 Camazon arrived in the United States as a seaman on the Danish ship "Korea". He was paid off in Baltimore and then signed on the "Nora" which left Baltimore on April 26, 1950. When the "Nora" reached Spanish Morocco on August 16, 1950, petitioner was paid off and immediately arrested by the Spanish police, who held him for six or seven months without a charge and then released him, after destroying his passport and documents.

On February 16, 1951 Camazon stowed away on the Norwegian vessel "Bluemaster" in Barcelona, Spain. When he boarded the vessel he did not know its destination. He wanted to go to any place where he could work and live. Relator, when he boarded the "Bluemaster", no matter where he ultimately landed, was in quest of either employment at sea or work ashore. On March 7, 1951 the "Bluemaster" arrived at Baltimore, Maryland. Camazon was interrogated by an Immigration officer on board and stated that he had a friend in Baltimore who could procure employment for him.

The next day Camazon was accorded the hearing, (the minutes of which are summarized above and below) by a Board of Special Inquiry at Baltimore, Maryland, on charges that he was (a) a stowaway, (b) an alien having no unexpired passport, (c) an immigrant having no valid visa, (d) an alien whose admission to the United States would be prejudicial to the public interest,

safety or security, and (e) an alien who was, at that time, and had been previously, a member of the Communist Party of a foreign state.

The minutes of that hearing of March 8, 1951 recited, at the outset thereof,

"NOTE: Interpreter and alien sworn; applicant warned re perjury, and informed as to constitutional rights and representation by counsel, applicant did not request counsel"

and, at the conclusion thereof,

"Chairman to Applicant through Interpreter:

"Q. Do you wish to appeal? A. No.

"Q. If you desire later to appeal, a notice in writing to that effect, addressed to the District Director, Immigration and Naturalization Service, Room 341, Post Office Building, Baltimore 2, Maryland, will be sufficient. Do you understand? A. (Complete address furnished to applicant)."

In addition to his history, relator testified at the hearing that he did not believe in democracy; that he was opposed to the French government then existing; that, not knowing the forms of governments in Russia and the United States, he could not say whether he liked them or not; that he believed in a form of government that did not let the workers starve; that he would fight any government that made him work and did not pay him for it or that did him harm; and that he would fight the then Spanish government until death.

The hearing was concluded on motion of one of the members of the Board of Special Inquiry as follows:

"I move that the applicant be excluded from admission to the United States under Section 3 of the Immigration Act of February 5, 1917, as a stowaway;[1] under Section 13(a)(1) of the Immigration Act of May 26, 1924, as an immigrant who is not in possession of a valid immigration visa;[2] and under Section 3 of the Immigration Act of February 5, 1917, and the Act ap-

---

1. Title 8 U.S.C.A. § 136(l).

2. Title 8 U.S.C.A. § 213(a) (1).

proved May 22, 1918, as amended, as an alien who is not in possession of an unexpired passport or other document in lieu thereof as required by the Executive Order now in effect.[3]

"I also move that the alien be excluded under the Act of October 6, 1918,[4] as amended, on the ground that he is an alien who is or has been a member of the Communist Party of a foreign state, and that he is an alien whose admission into the United States would be prejudicial to the public interest, safety, or security.[5]"

The respondent's return shows that the relator was not placed upon a ship, but instead was brought before the United States District Court at Baltimore, Maryland, and on March 16, 1951 (it not appearing whether he was tried and found guilty or pled guilty) sentenced to one year imprisonment for violation of Title 18 U.S.C.A. § 2199, the Stowaway Act. While relator was in the City Jail at Baltimore under said sentence and on March 21, 1951, the Immigration and Naturalization Service lodged a detainer with the United States Marshal. On February 26, 1952, while relator was still in custody at Norfolk, Virginia, he signed a letter, which was witnessed by an officer of the Immigration and Naturalization Service, stating

"In view of my exclusion from admission to the United States by a Board of Special Inquiry, I hereby specify Spain as the country to which I desire to be deported."

This habeas corpus proceeding then ensued. While somewhat obscure, the precise grounds upon which relief is sought appear, from the petition and traverse, to be:

1. That relator, if returned to Spain would be subjected to immediate execution;

2. That no inquiry was made to determine if relator's return to Spain would subject him to physical persecution and no opportunity to present evidence establishing that his return to Spain would subject him

to physical persecution was afforded relator, all in violation of Title 8 U.S.C.A. § 156, resulting in an abuse of power and the infliction upon relator of inhuman and unusually cruel punishment;

3. That although the Captain of the S.S. Bluemaster offered to employ relator in the crew of the vessel on the continuation of its voyage to Chile, the Immigration authorities in March, 1951, rejected that offer and instead subjected relator to trial and imprisonment for violation of the Stowaway Act;

4. That relator had no attorney at the hearing before the Special Board of Inquiry at Baltimore, Maryland, on March 8, 1951, resulting in his exclusion;

5. That the letter which relator signed on February 26, 1952, designating Spain as the country to which he desired to be sent, was not properly translated to relator and he was led to believe that it provided for his being sent to any country other than Spain.

Grounds 1, 2 and 5 above, pose the issue, apparently not heretofore directly decided, whether the amendment of Title 8 U.S.C.A. § 156 by the Internal Security Act of 1950, § 23, affected both exclusion and expulsion cases insofar as the country to which the alien might be sent is concerned.

■ Relator's status as an excluded alien was unaltered by his having been kept here for prosecution and imprisonment as a stowaway. United States ex rel. Ling Yee Suey, v. Spar, 2 Cir., 149 F.2d 881.

The disposition of excluded aliens, such as relator, is governed by Title 8 U.S.C.A. § 154. That of expelled aliens is governed by Title 8 U.S.C.A. § 156, amended as aforesaid by § 23 of the Internal Security Act of 1950. The exclusion section, § 154, which remains unchanged by the Internal Security Act of 1950 provides that excluded aliens

"shall be immediately sent back * * to the country whence they respectively came, on the vessels bringing them, un-

---

3. Title 22 U.S.C.A. § 223; Proclamation No. 2487, 6 F.R. 2617, 50 U.S.C.A.Appendix, note preceding section 1.

4. Intended to be October 16, 1918.

5. Title 8 U.S.C.A. § 137(1) and (2) (C).

less in the opinion of the Attorney General immediate deportation is not practicable or proper."

When the expulsion section, § 156, was amended by the Internal Security Act of 1950, § 23, it was provided that

"The deportation of aliens provided for *in this Chapter* and all other immigration laws of the United States shall be directed by the Attorney General to the country specified by the alien * * *. *No alien* shall be deported under any provisions of this chapter to any country in which the Attorney General shall find that such alien would be subjected to physical persecution. * * *" (Emphasis supplied.)

The exclusion section, § 154, is part of Chapter 6—"Immigration"—of Title 8 U. S.C.A. Does it follow that the 1950 amendment of the expulsion section, § 156, referring as it does to deportations provided for "in this chapter", shall be deemed thereby to have inferentially amended § 154, which admittedly speaks of the "deportation" of excluded aliens? Do the new provisions in § 156, giving the alien the right of choice of country and protection against being sent into persecution, take the place in § 154 of the requirement that he be "sent back" to the country from whence he came? The history of the Internal Security Act of 1950 indicates not.

Section 23 of the Internal Security Act of 1950, which amended 8 U.S.C.A. § 156 had its genesis in H.R. 10, passed by the House of Representatives at the 2nd Session of the 81st Congress on July 17, 1950, 96 Cong.Rec. 10460. H.R. 10 (as did its offspring, § 23 of the Internal Security Act of 1950) provided that an alien be deported to the country of his choice, if there acceptable. H.R. 10 (unlike its offspring) was completely silent however, as to any prohibition against the deportation of an alien to a country in which the alien would be subjected to physical persecution. During the debate on H.R. 10 in the House, attention was directed to the fact that

"One of the issues raised in the Wickersham Report on the Enforcement of the Deportation Laws by Rubin Oppenheimer was the cruelty involved in sending alien Communists *resident in the United States* to countries where their lives were endangered even though they might be citizens of such country (pp. 121–123). The report stops to say 'The Board of Review insisted upon making deportation a death sentence'. Under H.R. 10 not only can deportation be made a death sentence but it may result in deportation to a country, the language and customs of which the alien knows nothing." (Emphasis supplied.) 96 Cong.Rec. 10448.

H.R. 10 reached the Senate and was referred to the Senate Committee on the Judiciary on July 18, 1950 and on August 3, 1950 that Senate Committee favorably reported it with amendments, Senate Report 2239, 96 Cong.Rec. 11724. The bill as amended in the Senate, continued the requirement that deportable aliens be sent to the country specified by the alien, but also, for the first time, made provision that

"No alien shall be deported under any provisions of this Act to any country in which the Attorney General shall find that such alien would be subjected to physical persecution."

While amended H.R. 10 remained on the Senate calendar, and on August 8, 1950, the President addressed a message to Congress on internal security. 96 Cong.Rec. 12018. In that message the President said

"In addition to the criminal laws outlined above, there is a set of laws governing immigration, naturalization, and travel between our country and others. These laws permit the Government to *exclude or deport* any alien from this country who may be dangerous to our internal security, and to forbid or to regulate the travel abroad of United States citizens who may be engaged in subversive activity. * * *

"I recommend that the Congress enact legislation permitting the Attorney General to exercise supervision over aliens subject to *deportation* and to require them, under the sanction of criminal penalties, *to report their whereabouts and activities at regular inter-*

*vals.* In a number of cases, aliens under deportation orders cannot be deported because no other country will accept them. A bill pending before the Congress would permit the Attorney General in certain cases to detain such aliens in his custody for indefinite periods of time—not pursuant to a conviction for crime but on the basis of an administrative determination. Such action would be repugnant to our traditions, and it should not be authorized. Present law, however, is inadequate to permit proper supervision of *deportable* aliens, and should be strengthened as I have indicated." (Emphasis supplied.)

Thereafter and on August 10, 1950, a new bill, S. 4037, was introduced in the Senate and referred to the Senate Committee on the Judiciary. 96 Cong.Rec. 12145. S. 4037 was an omnibus bill, consolidating various other bills dealing with several aspects of internal security. On August 17, 1950, the Senate Committee on the Judiciary reported on S. 4037, Senate Report 2369. That report was made up of two parts—Part 1, the Majority Report and Part 2, the Minority Report. Section 23 of S. 4037 dealt with the amendment of 8 U.S.C.A. § 156. The Majority Report treated with § 23 of S. 4037 in the following language:

"Section 23 amends section 20 of the Immigration Act of February 5, 1917, as amended. (39 Stat. 890, 57 Stat. 553; 8 U.S.C. § 156.) This section incorporates the principal provisions of H.R. 10, as previously reported by the Committee on the Judiciary. * * *

"The purpose of section 23 is to amend existing laws relating to the deportation of aliens so that there may be more effective control over deportable aliens who cannot be deported for reasons beyond the control of the United States. The major provisions are as follows:

"1. The authority of the Attorney General to determine the country to which an alien *unlawfully in the United States* is to be deported is enlarged.

"2. The procedure to be followed and the control to be exercised by the Attorney General in dealing with aliens *illegally in the United States* is specified, and criminal penalties for violation of the terms of supervision of deportable aliens are provided.

"3. Criminal penalties for deportable aliens in the criminal, subversive, and immoral classes who willfully fail *to depart from the United States* are provided, but the courts, under certain conditions, are vested with power to release such aliens from confinement.

"As previously reported to the Senate by the Committee on the Judiciary H.R. 10 makes it a felony for any alien in the subversive, criminal, or immoral classes against whom an order of deportation has been entered *to remain in the United States* after 6 months from the date of entry of such order of deportation. Section 23 of the bill modifies this penalty by including an element of willfulness * * *." (Emphasis supplied.)

The Minority Report dealt with § 23 of S. 4037 thusly:

"Section 23 permits the Attorney General to exercise supervision over aliens subject to deportation and to require them, under the sanction of criminal penalties, *to report their whereabouts and activities* at regular intervals. These modifications of existing law simply and directly furnish the added measure of protection which the existing situation demands. They do so in conformity with the Constitution, and they should be enacted into law." (Emphasis supplied.)

S. 4037 was thoroughly debated in the Senate. 96 Cong.Rec. 14170, et seq. From these debates it is clear that the use of the phrases "deportation of aliens" and "no alien shall be deported" in § 23 of the bill was intended to apply solely to aliens subject to *expulsion* as distinguished from those subject to *exclusion*.

S. 4037 finally passed the Senate on September 12, 1950, but the Senate action was vacated and a House bill, H.R. 9490, identical so far as § 23 is concerned, was sub-

stituted therefor, and passed, on the same day. 96 Cong.Rec. 14628.

The conference report to the House on H.R. 9490, in dealing with § 23 of the bill, states

"Section 23 of the conference substitute amends section 20 of the Immigration Act of February 5, 1917, as amended (8 U.S.C. § 156), in order to provide more effective control over, and to facilitate the deportation of, deportable aliens.

"Subsection (a) of such section 20, as contained in section 23 of the conference substitute, retains certain provisions of the existing section 20 and also makes the following changes in, and additions to, such existing section 20: .   .   .   .

"The first sentence of such subsection (a) broadens the authority of the Attorney General under existing law to determine the country to which an alien *unlawfully in the United States* may be deported. The existing first sentence of section 20, which listed the countries to which an alien may be deported, is restrictive in scope. The new first sentence of subsection (a) provides that an alien may be deported to the country specified by the alien if such country is willing to accept him into its territory. In addition, it gives the Attorney General more latitude in effecting the deportation of a deportable alien (1) by enlarging the list of countries and places to which such alien may be deported if the country specified by such alien is unwilling to accept him into its territory or if he does not specify any country, and (2) by permitting the Attorney General to select the country or place to which such alien may be deported, within his discretion and without priority of preference because of the order in which such countries and places are set forth in the new sentence. It is further provided that no alien shall be deported to any country in which the Attorney General finds

that such alien would be subjected to physical persecution." (Emphasis supplied.) U.S.Code Cong.Serv., 1950, 81st Cong., 2nd Sess., p. 3911.

The Internal Security Act of 1950 was ultimately passed over the President's veto, 96 Cong.Rec. 15632 and 15726.

From the foregoing documentation and the debates, the deportation referred to in the amendment of 8 U.S.C.A. § 156 by the Internal Security Act of 1950, must be confined in application to *expelled* aliens and held not to apply to *excluded* aliens. The provision of 8 U.S.C.A. § 154, providing that excluded aliens "be immediately sent back, * * * to the country whence they respectively came" still prevails, unaffected by the Internal Security Act of 1950.

It is apparent that the amendment of Title 8 U.S.C.A. § 156 by § 23 of the Internal Security Act of 1950 was made with the internal security of the nation in mind and not with any solicitude for the objectionable alien's welfare. The enlargement wrought in the area to which the alien might be sent was prompted by the desire the more easily to rid ourselves of his harmful contamination.

One culls the record in vain for an indication that might reveal the humanitarian impulse of refusing to return even *excluded* aliens to physical persecution. The total absence of any such expression compels one to conclude the total absence of any such intent.

Thus, disposing of grounds 1, 2 and 5 of relator's petition and traverse, the Attorney General's decision to send relator, an *excluded* alien, back to Spain without inquiry to determine the possibility of his facing execution or physical persecution, must remain free from judicial interference. It is immaterial that the relator's alleged selection of Spain as his destination was obtained under allegedly questionable circumstances for, by the same token, the relator, an *excluded* alien, enjoyed no right of selection.[6]

---

**6.** This conclusion is inescapable despite the dictum in the majority opinion in United States of America ex rel. Mezei

v. Shaughnessy, 2 Cir., 195 F.2d 964, where it was suggested that the six month limitation upon the confinement

As to ground 3, the Attorney General was entirely within his authority in determining relator's "deportation * * * not * * * proper," 8 U.S.C.A. § 154, and in subjecting relator to criminal prosecution instead of permitting him to sign on as one of The Bluemaster's crew, in view of the relator's arrival on March 7, 1951 having been his second attempt to gain illegal admittance to this country as a stowaway.

Finally, ground 4 is disposed of by the quotation from the record of the hearing before the Special Board of Inquiry on March 8, 1951 where relator, although informed of his right to counsel, did not request such representation.

Writ dismissed.